Filed 5/27/26  P. v. Lainez CA2/6

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JOSE BALMORE SAVARIA LAINEZ, et al.,<br><br>    Defendants and Appellants. | 2d Crim. No. B321851<br>(Super. Ct. No. 1501755)<br>(Santa Barbara County) |

Jose Balmore Saravia Lainez (Balmore), Jose Ricardo Saravia Lainez (Ricardo), and Jose Narciso Escobar Hernandez (Hernandez) appeal after a jury convicted them on multiple counts of first-degree murder (Pen. Code,[1] §§ 187, subd. (a), 189), conspiracy to commit murder (§ 182, subd. (a)(1)), and criminal street gang conspiracy to commit murder (§ 182.5).  The jury also found true various gang, principal firearm discharge, and murder

---

[1] Unless otherwise noted, all undesignated statutory references are to the Penal Code.

special-circumstance allegations (§§ 186.22, subd. (b)(4), 190.2, subd. (a), 12022.53, subds. (d) & (e)).  Appellants were each sentenced to lengthy prison terms that include multiple indeterminate terms of life without the possibility of parole (LWOP), and were ordered to pay fines and assessments.[2]

Appellants contend the trial court erred in finding the prosecution did not unlawfully discriminate in exercising a peremptory challenge against a prospective juror and raise collective and individual claims of insufficient evidence, ineffective assistance of counsel (IAC), and instructional, evidentiary, prosecutorial, and cumulative error.  Appellants also request our independent review of the in camera hearings and sealed materials related to their *Hobbs* motions.  (*People v. Hobbs* (1994) 7 Cal.4th 948 (*Hobbs*).)  Finally, appellants ask us to strike and/or order correction of their fines and assessments.

We shall order that appellants' parole revocation fines be stricken and that Ricardo and Hernandez's court operations and court facilities assessments be corrected.  We shall also order

---

[2] Codefendants Jose Juan Sanchez Torres (Jose Torres) and Olvin Serrano each pleaded guilty to two attempted murders and admitted gang enhancement allegations and were each sentenced to terms of 24 years and 8 months in state prison.  In a separate jury trial, codefendants Luis German Mejia Orellana (Luis), Juan Carlos Lozano Membreno (Membreno), Marcos Manuel Sanchez Torres (Marcos Torres), Juan Carlos Urbina Serrano (Juan Serrano), and Tranquilino Robles Morales (Morales) were each convicted and sentenced to indeterminate terms on multiple counts of murder, conspiracy to commit murder, and criminal street gang conspiracy, and each of them have appealed  (*People v. Torres, et al.*, B320379.)  Charges were dismissed against prior codefendant Emadalio Mejia Bonilla (Bonilla) after he was sentenced to an LWOP term in a federal case.

correction of the minute order regarding Hernandez's sentence. Otherwise, we affirm.

*Gang Evidence*

Appellants were each convicted of committing their crimes as active members of and participants in the Santa Maria Little Salvy Loco Salvatruchas (SMLS'LS), a clique of the Mara Salvatrucha 13 (MS-13) criminal street gang.[3] Santa Maria Police Sergeant Scott Casey and former Santa Maria Police Sergeant/current Santa Barbara District Attorney's Office Investigator Michael Hoffman testified as the prosecution's gang experts.

MS-13 was originally formed in Los Angeles by refugees from El Salvador to provide protection from the 18th Street criminal street gang. In 1993, the gang added "13" to its name to show its allegiance to the Mexican Mafia state prison gang.

At all relevant times, MS-13 has engaged in a pattern of criminal activity that includes murder, attempted murder, extortion, and drug sales. Sergeant Casey opined among other things that in January 2013, an individual was shot to death in Santa Maria by SMLS'LS members because he was a perceived rival of MS-13. Between 2013 and 2016 there were about 65,000 MS-13 members worldwide, about 7,000 to 10,000 of whom were in the United States. All MS-13 members in the United States are controlled by the MS-13 gang in El Salvador. MS-13's original motto was "kill, rape, and control." More recently, some

---

[3] The clique was previously named Santa Maria Lil Salvy and identified by the moniker SMLS. In January 2016, the clique modified its name and moniker to avoid confusion with the MS-13 SMLS clique in El Salvador. For ease of reference, we consistently refer to appellants' clique as SMLS'LS.

MS-13 members disagreed with including "rape" in the gang's motto in light of the Mexican Mafia's philosophy of not hurting women and children.

In 2015 to 2016, SMLS'LS had 32 members. Codefendant Juan Serrano, a.k.a. "Peligro," was the leader of the clique. In January 2016, Juan Serrano sent an MS-13 member in El Salvador a list of the "homeboy" members of the SMLS'LS clique that included appellants Balmore (a.k.a. "Duende"), Ricardo (a.k.a, "Lagrima"), and Hernandez (a.k.a. "Cuervo"); codefendants Olvin Serrano (a.k.a. "Catracho"), Luis (a.k.a. "Smiley"), Membreno (a.k.a. "Psycho"), Marcos Torres (a.k.a. "Silent"), and Morales (a.k.a. "Bandito"); former codefendant Bonilla (a.k.a. "Espia"); and Christian Orellana (Christian; a.k.a "Maldito), Ezequiel Escalante-Rivera (Escalante-Rivera; a.k.a. "Callado"), David Rivera (Rivera; a.k.a. "Maliente"), and Luis David Quintanilla (Quintanilla; a.k.a. "Fantasma"). Members achieve "homeboy" status after they have committed a violent crime as a form of induction and are formally "jumped in" to the gang by being assaulted by other members. Homeboys are expected to continue participating in and furthering MS-13's criminal activities. Sergeant Casey opined that Luis and Christian's brothers, Jose Francisco Mejia Orellana (Jose Francisco) and Jose Eleuterio Mejia Orellana (Jose Eleuterio), and others were also active members of and participants in the gang.

Photographs obtained from various phones and social media depicted Balmore, Hernandez, and codefendants Morales, Marcos Torres, and Jose and Olvin Serrano displaying MS-13's hand sign. A photograph from Hernandez's phone depicted "SMLS" graffiti from the Pirates Cove area of Avila Beach, where the clique's homeboys held their monthly meetings. A

4

photograph from Ricardo's phone depicted the MS-13 creed "don't see, don't hear, don't speak." Ricardo also exchanged text messages with Juan Serrano and other SMLS'LS members that discussed going after "snitches" and included photographs of MS-13 related tattoos. Appellants were further identified as members of the gang in a rap song video created by fellow gang member Jose Soriano (Soriano). Based on his investigation, Sergeant Casey opined that appellants, their co-defendants, and others were members and active participants in SMLS'LS and MS-13 when the charged crimes were committed.

SMLS'LS territory in Santa Maria included the area bordered by Blosser Road to the west, Boone Street to the south, Depot Street to the east, and Cypress Street to the north. SMLS'LS also claimed territory in the area bordering Oxnard and Port Hueneme. SMLS'LS and MS-13's main rival is the 18th Street gang and SMLS'LS's local rivals are the Northwest and West Park gangs. Rival gang members who enter SMLS'LS's territory are met with violence.

MS-13 members use coded language among themselves. "Soup" and "crown" are code words for kill, and "chicken" is used to refer to a potential victim or target. Members of the gang express their disrespect for 18th Street gang members by calling them "girls" or "chavalas," and referring to them with the feminine form of other Spanish words.

*Murder Of Modesto Melendez (counts 40 & 41)*[4]

On the night of May 16, 2015, Modesto Melendez (Modesto) was shot to death on Williams Street in Santa Maria. A witness who lived on nearby Pine Street was working on his car that night when a black SUV with four male occupants parked behind his car. The two men in the back seat of the SUV, who each appeared to be about 25 years old and were wearing baggy clothing and hooded sweatshirts, got out of the vehicle and walked onto Williams Street. After four gunshots rang out, the two men ran back onto Pine Street where the SUV picked them up before heading south on Pine and then driving away. Other witnesses also heard the gunshots and saw the two men running away.

At 8:22 p.m., 911 received a call that a man appeared to have been shot in his car on Williams Street. The police responded to the scene and found a car parked along the curb. The driver's side window was shattered and Modesto was in the driver's seat with bullet wounds to his neck and chin and his cellphone was in his lap near his hands. He was pronounced dead at the scene.

A Facebook Messenger contact for "Celeste Montalvo" ("Montalvo"), a.k.a. Aslin Bonilla, was subsequently found on Modesto's cellphone. The phone number used to create "Montalvo's" Facebook Messenger account belonged to Bonilla, who had a tattoo of the name "Aslin" on his arm. Several messages in the account referenced MS-13 and the account had

---

[4] Balmore was convicted on count 40 of first-degree murder, and Ricardo was convicted on count 41 of criminal street gang conspiracy to commit murder. Hernandez was found not guilty of both offenses.

been used to communicate with SMLS'LS member German Rodriguez in November 2014, and with Olvin Serrano in early 2015. The account was also saved as a contact in Ricardo and Morales's phones.

Modesto and "Montalvo" began sending messages to each other in January 2015, after Modesto accepted "Montalvo's" friend request. In their messages, Modesto and "Montalvo" both said they were single and were from El Salvador. "Montalvo" told Modesto her cousin was from the 18th Street gang. Modesto replied that although he was not a member of that gang, the gang used to take care of him, so he was not afraid. In messages sent to a different account, Modesto stated he was a member of the 18th Street gang but had "retired."

Two days before Modesto was murdered, "Montalvo" sent him a photograph of a woman in lingerie and invited him to come to her house on May 16th after her aunt left. On the morning of May 16th, Modesto and "Montalvo" discussed their meeting and agreed to meet at 7:30 p.m. At 7:17 p.m., "Montalvo" sent Modesto a message stating " '[m]y love, the house number is 602 Williams Street.' " Over the course of the day Modesto repeatedly called the phone number "Montalvo" had given him, with the last call being made just four minutes before the first 911 call reporting the shooting.

Throughout that day and leading up to the time of the shooting, Balmore, Ricardo, Bonilla, Olvin Serrano, and Escalante-Rivera called or messaged each other numerous times. Ricardo also repeatedly called or sent messages to a phone number belonging to a woman named Vilma who was in a relationship with Bonilla. Some of the calls were close in time to the communications between Modesto and "Montalvo." Ricardo's

cellphone usage was consistent with being in the area of the crime scene around the time of the 8:22 p.m. 911 call and then heading south in a vehicle. Balmore's cellphone was south of the crime scene 20 minutes after the 911 call. Sergeant Casey opined that Modesto's murder benefitted appellants' gang by eliminating a rival gang member.

*Murder Of Oscar Joaquin And Attempted Murders Of*
*V. Cantu and K. Ranmarine (counts 37-39)[5]*

On July 28, 2015, Northwest gang member Cantu[6] was in a park in Santa Maria when a friend called and said his brother had been "jumped" by rival West Park gang members. Cantu decided to go look for West Park members to fight and was picked up in a stolen truck by Ranmarine, a Northwest associate, and a Northwest member named Hector. The truck subsequently picked up a few more people, including Oscar Joaquin (Joaquin), who was also a member or associate of the Northwest gang.

Cantu, Ranmarine, and Joaquin drove around in the truck after the others transferred to another vehicle. After the truck ran out of gas, they left it at a gas station at the intersection of

---

[5] Balmore and Ricardo were found guilty on counts 37, 38 and 39 of criminal street gang conspiracy to commit murder. Hernandez was found not guilty of those crimes, and all three appellants were found not guilty of the first-degree murder of Joaquin and conspiracy to commit the murders of Cantu and Ranmarine.

[6] Cantu, who was charged with conspiracy to commit assault with a deadly weapon with a gang enhancement, entered a plea deal in which he received immunity for testifying at appellants' trial and was placed in the witness protection program. Ranmarine did not testify but was also placed in witness protection.

Main Street and Blosser Road and set out to walk to Cantu's aunt's house. Ranmarine and Cantu each carried a machete and Joaquin had a baseball bat. As they were walking near the intersection of Barrett and Western Streets, which is in MS-13's territory, they were confronted by two men in black clothing. One of the men said, " '[w]hat's cracking with you fools' " and the other man pulled out a baseball bat. They all began fighting and Cantu swung his machete but did not strike anyone. Gunshots suddenly rang out and they all ran. Cantu heard nine gunshots as he dropped his machete and ran to a nearby Walmart, where he called his mother to pick him up.

At 10:02 p.m., a resident of the area called 911 to report that someone had been shot in front of her house. Joaquin, who was shot six times from behind and suffered eleven incise wounds that included a severed wrist, was found lying on his back in the intersection and subsequently died from his injuries. Cantu and Ranmarine both escaped without injury.

Federal Bureau of Investigation Agent Michael Easter analyzed the cellphone records in the case and testified for the prosecution. The cellphone usage of Balmore, Rivera, Luis, and Quintanilla was consistent with each of them being in the vicinity of the crime scene around the time of the 911 call at 10:02 p.m. Ricardo's phone was active in the area south of the crime scene at 8:31, 10:11, and 10:14 p.m. The phones of several other SMLS'LS members were also in the same area during the same timeframe. Call-detail records showed an increase in the number of calls between Balmore, Ricardo, and their fellow SMLS'LS members from 6:00 to 10:59 p.m. Multiple calls took place between 8:39 and 11:38 p.m., and all calls were less than a minute long with many less than 30 seconds. According to

9

Sergeant Casey, Joaquin's murder and the attempted murders of Cantu and Ranmarine benefitted appellants' gang by protecting their territory from perceived rivals.

*Attempted Murders Of E. Martinez, M. Castillo,*
*And J. Alfaro (counts 28-33)*[7]

On the night of September 28, 2015, Martinez, Castillo, and Alfaro were all shot while standing together outside a market on the corner of Blosser Road and Cypress Street. A few weeks prior to the shootings, Martinez and Alfaro were walking in the alley behind the market when a black truck drove towards them. As the truck was passing, the two young men in the truck flashed hand signs and yelled " 'Mara.' " Martinez and Alfaro ignored them and kept walking.

On the night of the shootings, Martinez walked to the market and drank beer outside with Alfaro and Castillo. Surveillance video from two nearby businesses depicted the shootings and preceding events. At 7:51 p.m., Alfaro was seen walking and standing by the market. A white Nissan Altima associated with Escalante-Rivera began circling the area two minutes later, and Martinez joined Alfaro outside the market shortly thereafter. At 8:14 p.m., a Ford truck associated with Membreno began circling the area. At 8:36 p.m., a blue Toyota Corolla associated with Balmore began circling the area and Castillo joined Martinez and Alfaro. Shortly before 11:00 p.m., the market closed and the employees began leaving. A few

---

[7] Ricardo And Hernandez were found guilty on counts 28, 29 and 30 of conspiracy to commit murder, and on counts 31, 32 and 33 of criminal street gang conspiracy to commit murder. Balmore was found not guilty on counts 28, 29 and 30, but guilty on counts 31, 32 and 33.

minutes later, the Ford truck and Nissan Altima began repeatedly circling the area. At 11:16 p.m., two individuals with handguns approached Martinez, Alfaro and Castillo and shot all three of them without saying anything. The assailants appeared to be Hispanic and in their 20's and wore dark hoodies or ski masks over their faces. Alfaro called 911 at 11:21 p.m.

Martinez, Alfaro and Castillo all suffered significant injuries but survived. Seventeen cartridge casings and three intact bullets were recovered from the scene. Martinez was hospitalized for a year as a result of his injuries and lost his right leg, part of his intestine, one of his kidneys, and part of his liver. All three victims denied gang membership and there was no evidence otherwise.

The cellphone usage of Ricardo, Membreno, Marcos Torres, Quintanilla, Rivera, and Juan Serrano was consistent with them being in the general area of the crime scene shortly after the shootings. The cellphone usage of Escalante-Rivera, Membreno, Luis, and Quintanilla was consistent with them being in a vehicle that was circling the area of the crime scene prior to the shootings. Hernandez's cellphone was activated in the area just east and north of the crime scene at 10:35, 10:39, and 10:41 p.m., and south of the crime scene at 10:37 p.m. Between 8:01 p.m. and Alfaro's 911 call at 11:18 p.m., there were multiple brief calls between Ricardo, Quintanilla, and other members of the SMLS'LS gang. There was no activity on the phones from 11:18 until 11:23 p.m. After Alfaro's 911 call at 11:21 p.m., there were multiple calls between Hernandez and Quintanilla and Hernandez and Luis.

Sergeant Casey opined that the shootings of Martinez, Castillo and Alfaro benefitted MS-13 because the victims were

11

perceived rivals who infringed on the gang's territory and remained in the area after being challenged.

*Murder Of Abrahan R. (count 26)*[8]

Shortly before 7:30 p.m. on October 30, 2015, Abrahan R. (Abrahan) and his 15-year-old brother Hugo were walking near the corner of Smith and Cypress Streets when two men wearing sweatshirts with their hoodies up approached them and began shooting at them. Hugo ran to a nearby alley and heard six or eight additional gunshots. After waiting a few minutes, Hugo returned and found Abrahan lying on the ground and bleeding from multiple gunshot wounds. The police received a 911 call about the shooting at 7:39 p.m. Before Abrahan died en route to the hospital, he told the police that the shooters fled in a gray Chevy vehicle.

Abrahan was a former West Park gang member but had been trying to get away from the gang. He was shot just outside of MS-13's territory. A couple of hours after the shooting, Quintanilla messaged Juan Serrano that " 'the flower is activated' " and " 'we crowned,' " which meant they had completed their mission and killed someone.

---

[8] Appellants were found guilty on count 26 of criminal street gang conspiracy to commit Abrahan's murder. They were acquitted on count 24 of first-degree murder, and on counts 25 of conspiracy to commit the murder of Abrahan's brother Hugo. (We refer to Abrahan and Hugo by their first names to protect Hugo's identity.) The jury was unable to reach a verdict on count 27, which charged appellants with criminal street gang conspiracy to murder Hugo, and those charges were ultimately dismissed.

Balmore's cellphone usage was consistent with being south of the area of the crime scene around the soccer field at Depot Street and Enos Drive between 6:11 and 7:37 p.m., and Ricardo's cellphone was consistent with being near the same area at 6:11 p.m. The cellphones of several other SMLS'LS members were also consistent with being in or near the area of the crime scene around the time of the shooting. From 5:16 p.m. and 5:22 p.m. there were multiple brief calls between Hernandez and Quintanila, as well as calls between Ricardo and Quintanila, Marcos Torres, and Jose Torres. From 7:17 p.m. until the 911 call at 7:39 p.m., there were brief calls between Balmore and Quintanilla and Ricardo and Quintanilla, as well as calls between other SMLS'LS members. Seconds after the 911 call there was a call between Luis and Juan Serrano followed by brief calls between Hernandez and Morales, Hernandez and Marcos Torres, and Ricardo and Bonilla, in addition to several calls between other SMLS'LS members.

Sergeant Casey opined that that the murder of Abrahan benefitted MS-13 because he and Hugo were perceived rival gang members.

*Murder Of Ulises Garcia-Mendez And Attempted Murders Of G. Gonzalez And R.R. Flores (counts 18-23)*[9]

On the night of November 20, 2015, 17-year-old Ulises Garcia-Mendez (Garcia-Mendez), 16-year-old Gonzalez, and

---

[9] Balmore and Ricardo were convicted on count 18 of the first degree murder of Ulises Garcia-Mendez, and on counts 19 and 20 of conspiracy to commit the murders of Gonzales and Flores. Hernandez was found not guilty on counts 18, 19, and 20, but guilty on counts 21, 22, and 23 of criminal street gang conspiracy.

13

Gonzalez's uncle Flores were walking on Thornburg Street when three men approached, shot all three of them, and then ran away. Before the shooting, one of the perpetrators said, "what's up."

The police received a 911 call about the shootings at 7:56 p.m. Gonzalez and Flores survived but Garcia-Mendez, who was shot 10 times, did not. The police recovered 16 nine-millimeter Luger shell casings near Garcia-Mendez's body, all of which had an "RP" or "A-USA" head stamp.

Sergeant Casey opined that Gonzalez and Flores were members of the West Park gang. Garcia-Mendez was not known to be associated with any gang.

Cellphone usage of Balmore and other SMLS'LS members was consistent with them being at the area of the crime scene around the time of the 911 call. Hernandez's phone was active in the area north of the crime scene at 6:21 p.m. and 8:02 p.m., and Ricardo's phone was active in the same area at 7:59 p.m. Hernandez's phone activated the same cell tower and sector as Ricardo's phone. Between 6:49 p.m. and the 911 call at 7:56 p.m., there were multiple brief calls between Balmore and other SMLS'LS members. Shortly after the 911 call, there were calls between Balmore and Morales, Balmore and Quintanilla, and Ricardo and Membreno. At 8:02 p.m., Ricardo texted Balmore "Brother, was the soup already made?" At 8:03 p.m. there was a call between Balmore and Ricardo, followed by calls several minutes later between Juan Serrano and Marcos Torres and a call from Hernandez to Juan Serrano. At 9:02 p.m., Ricardo sent Juan Serrano a text asking, "which chicken did you guys fly," followed by a call between them at 9:07 p.m.

14

Sergeant Casey opined that the shootings benefitted MS-13 by eliminating rivals, which allowed them to expand their territory and control.

*Murder Of Brayan Mejia Molina (counts 16 & 17)*[10]

On the night of December 4, 2015, 18-year-old Brayan Mejia Molina (Brayan) was shot to death while in his vehicle near his residence on Sonya Lane. A witness saw a light-skinned individual shooting into the vehicle. Another witness who lived on Sonya Lane heard the gunshots, looked outside, and saw two young light-skinned Hispanic men run away to the nearby cul-de-sac behind a gate. She then saw two vehicles in the cul-de-sac turn around. After being shot, Brayan crashed his vehicle into a light pole. He sustained 10 gunshot wounds and died at the scene.

Mr. Mejia, Brayan's father, subsequently provided the police with a video of Brayan dancing while wearing a soccer jersey with the number "18" on it. The police also obtained a photograph of Brayan, who was from an area dominated by the 18th Street gang, pointing a middle finger toward someone throwing an MS-13 gang sign.

The cellphone usage of Balmore, Ricardo, Hernandez, and other SMLS'LS members was consistent with them being at the area of the crime scene around the time of the 911 call at 9:34 p.m. Between 8:36 and 9:21 p.m., there were multiple brief calls between Balmore and others. Less than a minute after the 911

---

[10] Balmore and Ricardo were convicted on count 16 of first degree murder. The jury was unable to reach a verdict as to Hernandez on that count, but convicted him on count 17 of criminal street gang conspiracy to commit murder.

15

call there was a 17-minute call between Hernandez and Juan Serrano, followed by a call from Luis to Balmore that was either "dropped" or went directly to voicemail. At 11:32 p.m., Richard texted Juan Serrano "We crowned, fool," meaning they had killed someone. At 12:08 a.m., Ricardo sent Escalante-Rivera a news article about the shooting. At 1:31 a.m., he sent Bonilla a text in Ohio stating, "We made soup today."

Sergeant Casey opined that Brayan's murder benefitted MS-13 by eliminating a perceived or actual rival.

*Murders Of Javier Murillo-Sanchez And Aaron Hernandez-Sanchez (counts 12-15)*[11]

At about 6:30 p.m. on January 12, 2016, cousins Javier Murillo-Sanchez (Murillo-Sanchez) and Aaron Hernandez-Sanchez (Hernandez-Sanchez) were shot to death while walking together on South Oakley Avenue. Surveillance video from a nearby business showed a car pull up and park near the southeast corner of Church Street and South Oakley Avenue while a second car parked further north on South Oakley and a third car was on Church Street to the west. After the victims walked past the first car, three men got out, started following them, and shot them while they were crossing the street. The suspects then ran to their car and all three cars drove away. Each victim sustained seven gunshot wounds.

The cellphone usage of Balmore, Hernandez, and six of their codefendants was consistent with all of them being at the

---

[11] Ricardo and Hernandez were convicted on counts 12 and 13 of first degree murder. Balmore was found not guilty on those counts, but guilty on counts 14 and 15 of criminal street gang conspiracy to commit murder.

area of the crime scene around the time of the 911 call at 6:31 p.m. Ricardo's phone was not in the crime scene area around 6:31 p.m. but moved south of the area after the 911 call was made. There were multiple brief calls among the group between 5:51 p.m. to 6:30 p.m., followed by multiple brief calls after the 911 call was made. A couple of hours later, Ricardo messaged Soriano that they were "[c]elebrating a double soup" and added, "two chickens, we made soup" and "[h]ere we are eating the soup."

The shootings occurred just outside of MS-13's claimed territory. Murillo-Sanchez was a West Park gang member, but there was no evidence that Hernandez-Sanchez had any gang affiliation. Sergeant Casey opined that Murillo-Sanchez and Hernandez-Sanchez were targeted because of where they were walking and how they were dressed and that the murders benefitted MS-13 by eliminating perceived rivals who were "infringing" on the gang's territory.

*Murders Of Augustine Jaime Montano-Barajas And Donaciano Morales-Suarez (counts 8-11)*[12]

At approximately 9:45 p.m. on January 25, 2016, Augustine Jaime Montano-Barajas (Montano-Barajas) and Donaciano Morales-Suarez (Morales-Suarez) were shot to death while in Morales-Suarez's car on South Elizabeth Street. Morales-Suarez crashed the car after being shot three times. Montano-Barajas, the front seat passenger, sustained 13 gunshot wounds.

---

[12] Ricardo and Hernandez were convicted on counts 8 and 9 of first degree murder. Balmore was found not guilty on those counts, but guilty on counts 10 and 11 of criminal street gang conspiracy to commit murder.

17

A witness who called 911 at 9:46 p.m. reported seeing two "gang members" outside his house "running around shooting" before running towards the intersection of South Elizabeth and East Cook Streets. Shortly after the shootings, another witness who lived on East Cook Street saw two men run and get into the backseat of a car that drove away. A third witness, who also lived on East Cook Street, saw two men in dark clothing walking on the street before getting into a car that drove away; one of the men got in the front passenger seat, while the other got in the rear passenger seat behind the driver.

Sergeant Casey opined that Montano-Barajas was an 18th Street gang member because he had numerous gang-related tattoos and there were photographs of him wearing an "18" jersey and making one of the gang's hand signs. There was no evidence that Morales-Suarez had any gang affiliation.

The shootings occurred as Morales-Suarez was dropping Montano-Barajas off at his residence after the two had worked out at a nearby gym where Balmore and Morales were also members. Shortly after Morales-Suarez had signed into the gym six nights earlier, Morales texted Juan Serrano that he was at the gym and that " 'there is a girl here from the alley.' " The next evening, Ricardo texted Morales " 'we are here ready. The girls didn't go. Let us know.' " Morales responded " '[t]he chicken fell down' " and Ricard replied, " '[a]ll right. We're going now.' " Morales subsequently sent a message to Marcos Torres stating that " '[t]he signal will be when I call you' " and giving a description of two men, one " 'tall' " and one " 'short.' "

On the night of the murders, Morales-Suarez signed into the gym at 8:13 p.m. At 9:48 p.m., the police received a 911 call reporting a suspicious black truck in the area where the

18

shootings occurred.  At 11:19 p.m., Ricardo texted Juan Serrano that the "pigeon" was gone.  The next day, Bonilla sent Membreno a message from Ohio congratulating him on "making soups" and urging him to "keep it up."

The cellphone usage of Hernandez, Membreno, Morales, Juan Serrano, and Luis were consistent with each of them being at the area of the crime scene around the time of the 911 call at 9:46 p.m.  Ricardo's phone was south of the crime scene at 9:18 p.m.  There were multiple brief calls and texts among the group that night prior to and shortly after the murders, as well as a brief call between Balmore and Morales at 6:03 p.m.

Sergeant Casey opined that Montano-Barajas was targeted by MS-13 as a result of his tattoos and that his murder benefitted the gang because it involved tracking and eliminating a member of the gang's primary rival.

### Conspiracy To Murder J.M. Melendez And S. Melendez And Criminal Street Gang Conspiracy (counts 5 - 7)

In December 2015, J.M. Melendez (J.M.) and his uncle S. Melendez (Melendez) lived in Guadalupe.  Modesto, who was murdered in May 2015 (see *ante*, p. 6), was J.M.'s cousin.

On December 2, 2015, Bonilla, who was in Ohio, told Ricardo he had photographs of rivals in Guadalupe and sent Facebook profile screenshots of J.M., Melendez, and three other men.  Ricardo responded that they would "make soup" later.  Bonilla replied that he was going to kill someone soon and sent Ricardo an image of a person's back with a large 18th Street tattoo.  Ricardo sent the screenshots he had received from Bonilla to Marcos Torres, Olvin and Juan Serrano, and Escalante-Rivera, and they all discussed the individuals depicted in the screenshots.

19

On January 28, 2016, wiretaps were authorized on Balmore and Ricardo's cellphones. On February 17, 2016, authorized wiretaps were added to Hernandez and Luis's phones.

In January and February 2016, J.M. and Melendez were working in the agricultural field on Garey Street with a crew that included Luis, a.k.a. "Min"; Marcos Torres; Jose Torres's girlfriend Enedina Tomas, a.k.a. "Mimi;" J.M.'s cousin Franklin; and a woman named Mayra. J.M. drove a green Toyota Corolla, and Franklin drove a white Honda Civic.

On February 2, 2016, Ricardo and Luis talked about going to look for "girls." Luis said that Juan Serrano would be driving a gray car and that Membreno would be driving "the bambina," a black Ford F-150 truck that belonged to the clique. The next day, Ricardo and Marcos Torres discussed going to find the targeted victims.

On February 6, Ricardo, Hernandez, Luis, Membreno, and Morales agreed to meet up and look for "the girls" after they got off work. Ricardo and Luis agreed they would not let "those fuckers" get away. They expressed concern about missing the victims and discussed going to the agricultural field to find them. Shortly thereafter, Luis told Ricardo the victims were in a white Honda and a green Toyota that was driving into a nearby gas station. Luis confirmed that J.M. was driving the Toyota. At 1:16 p.m., Ricardo and Luis discussed going to Guadalupe and having Olvin Serrano flash his lights when he pulled up behind them.

At 1:37 p.m., Ricardo told Luis he had lost sight of J.M.'s Toyota and asked for the vehicle's license plate number. Luis did not know that information and instead gave Ricardo the partial license plate number of the white Honda. At 1:50 p.m., Ricardo

20

and Luis discussed meeting at Olvin Serrano's house.  Luis also told Ricardo he had "two tacos," i.e. drugs, and Ricardo said someone wanted one

At 3:29 p.m., Carlos Antonio Rivera Mendez, a.k.a. "Tono," asked Ricardo if he wanted "to go and run" at Los Pozos and asked him to contact Luis.  A minute later, Ricardo and Luis discussed wanting "to go run."  Luis noted they did not have a car and told Ricardo the "chickens" were returning to work.  Ricardo replied, "It's hard to do that [thing] there."  They agreed to continue looking.

At 11:10 a.m. on Sunday, February 7, Ricardo asked Luis if they were already in Guadalupe.  Luis replied that he and Olvin Serrano were almost there.  In a 2:49 p.m. group call with Hernandez, Luis, and Juan Serrano, Ricardo said they needed to "make sure" that "the chickens" were there.  Three minutes later, Ricardo and Morales discussed going to look for "the chickens" at around 6:00 or 7:00 p.m.  Ricardo told Morales to take Balmore's car.

At 4:27 p.m., Ricardo and Balmore discussed taking Balmore's gray car at around 6:00 p.m. to find the "chickens" and "turn them into soup."  Approximately 30 minutes later, Balmore told Morales he would pick him up in 20 minutes.  At 5:21 p.m., Balmore and Morales arrived at Ricardo's residence to pick him up.  At 5:50 p.m., Ricardo told Juan Serrano that "we" were where J.M. and Melendez were supposed to be, but the police were present.  Ricardo said they would return the following day.

That same day, the police went to conduct video surveillance at Minami Park and the adjoining soccer fields. Hernandez arrived at the soccer field driving a black Ford F-150 truck along with Ricardo, who was wearing a jersey with the

21

number "13" on it, and Ricardo's girlfriend Mayra Ortega. Juan Serrano arrived in a Toyota Camry. Orellana, Membreno, and Marcos Torres were also present.

Before Ricardo's 5:50 call with Juan Serrano, police detectives identified Franklin's white Honda and located J.M. and Melendez at a soccer field in Guadalupe. The detectives told J.M. and Melendez their lives were in danger and took them into protective custody.

The next day, the SMLS'LS members continued looking for J.M. and Melendez. At 6:51 a.m. that morning, Luis told Ricardo that he and others had gone to where J.M. and Melendez had been the day before but did not find them. A few hours later, Ricardo had Jose Torres contact "Mimi" to find out J.M. and Melendez's work schedule.

In another series of phone calls, Balmore agreed to help Marcos Torres get his car released from impound at the Santa Maria police station. Balmore and his girlfriend subsequently arrived at the police station in a black Yukon. Membreno, Marcos Torres, and Marcos Torres's girlfriend Mayra Gomez arrived in Membreno's Ford F-150 truck, which had distinctive white striping on the sides and back. In other calls later that day, Luis told Ricardo that Membreno and Jose Torres had not seen J.M. and Melendez in the fields, and Ricardo and Balmore discussed not finding them at their residences. The following day, Ricardo and Juan Serrano discussed their inability to find the "chickens" and said they had disappeared because they were afraid.

In a February 10, 2016 phone call, Ricardo told Bonilla they were ready and had planned to get J.M. and Melendez but they had disappeared. Bonilla suggested that J.M. and Melendez

22

might have known they were being followed and that Ricardo should also be alert because the police might be aware of what was happening. That afternoon, Ricardo and Morales agreed to go to Guadalupe to continue looking for J.M. and Melendez. Later, Ricardo told Hernandez that he and Morales had arrived in Guadalupe. Hernandez said that he, Membreno, Luis, and "Mimi" had unsuccessfully looked for J.M. and Melendez at their workplace.

On the afternoon of February 12, 2016, the police issued a ruse press release stating that J.M. and Melendez had been arrested by Immigration and Customs Enforcement for identity fraud. Approximately 40 minutes later, Ricardo told Hernandez that J.M. and Melendez had been arrested by immigration authorities.

Sergeant Casey opined that murdering J.M. and Melendez would have benefitted MS-13 because the men were perceived rivals of the gang and the elimination of rivals benefits the gang.

*Conspiracy To Commit Murder Of John Doe 1 (count 1)*[13]

On February 13, 2016, Ricardo, Balmore, Escalante-Rivera, Morales, Membreno, and Marco Torres discussed meeting at 7:00 p.m. at the beach. SMLS'LS members held their gang meetings at Pirate's Cove near Avila Beach. On the afternoon of February 16, Luis talked to Ricardo about doing "gang business" in Oxnard. On February 18, Ricardo and Hernandez participated in calls regarding the sale and delivery of narcotics and Ricardo inquired regarding the status of the previously discussed plans to buy two firearms in Bakersfield.

---

[13] Appellants were found not guilty on counts 2, 3, and 4 of conspiracy to commit the murders of John Does 2, 3, and 4.

23

On February 20, 2016, Sergeant Casey discovered that several SMLS'LS members had travelled to Bakersfield. During phone calls, Ricardo discussed testing and purchasing a .38-caliber firearm. Later that evening, Luis told Hernandez he was in Bakersfield with his brothers and had just purchased a gun. On February 21, Luis told Ricardo that his brother Jose Eleuterio would be travelling to Oxnard with one of the guns the next day. Morales later called Ricardo to confirm he had the .38-caliber firearm.

The next day, Balmore and several other SMLS'LS members travelled from Santa Maria to Oxnard. Hernandez and Marcos Torres discussed picking up a firearm and giving it to Balmore, and Balmore and Marcos Torres discussed taking "the toys" to Oxnard. Hernandez also told Juan Serrano he would bring "the girl," i.e., the gun, to "those fools" in Oxnard.

At 5:28 p.m., Hernandez asked Soriano, who lived in Oxnard, if there were any rival gang members there and Soriano replied they were "always here." Hernandez said Balmore and Morales were also coming to Oxnard and were bringing guns, including a CZ and the recently purchased .38-caliber firearm.

Concerned by what they were hearing, the Santa Maria police alerted the Oxnard Police Department and continued providing them with updated information. The Oxnard police sent a heavy presence to several locations around Perkins Road and Cuesta Del Mar Drive based on the cellphone pings and drove with their lights and sirens on for approximately two hours.

At 7:10 p.m., Hernandez and Juan Serrano, who did not go to Oxnard, discussed awaiting news from their fellow gang members who were there. A minute later, Hernandez called

24

Catherine Rodriguez, a.k.a. "Lazy," and told her Balmore was in Oxnard. Hernandez and Rodriguez also discussed a shooting in Oxnard on February 16 in which Hernandez had participated. At 7:26, Luis referred to the alleyways near the intersection of Perkins and Cuesta Del Mar and told Christian that four rivals were coming down the alleyway by the school. A few minutes later, Christian confirmed that Balmore and Jose Francisco were positioned in their cars near the alleyway. Luis expressed concern that there were too many surveillance cameras in the area and told Christian to get set up in a more secure location.

At 7:43 p.m., Luis told Juan Serrano they had lost sight of their targets after they went into an apartment complex and were waiting for them to come out to an area away from the surveillance cameras. Luis reported that he was in a car with Morales and Marcos Torres while Balmore was in another car. At 8:02 p.m., Luis said that rivals had fired a shot, that there were a lot of police in the area with their sirens on, and that they would wait and see if they could get their targets to move closer to the 101 Freeway. At 8:54, Marcos Torres told Luis they were heading back to Santa Maria. At 10:10 p.m., Balmore texted Ricardo that they were just leaving. Ricardo asked if they "made soup" and Balmore replied they had not because the area was "really hot" with the police.

On the morning of February 23, 2016, Ricardo asked Luis if they were going back to Oxnard. Ricardo said he had heard "it's hot down there." Luis and Membreno subsequently discussed consulting with Hernandez on whether they would be going back to Oxnard. Balmore and Luis both said they would be returning, with Luis adding that they would go back the following day.

25

The next afternoon, Ricardo, Hernandez, Membreno, Luis, and Juan Serrano drove back to Oxnard. That night, the Oxnard police saturated the area around Perkins and Cuesta Del Mar, the 5400 block of J Street, and the Port Hueneme Beach public parking lot with marked patrol cars and the sheriff's helicopter. Ricardo, Hernandez, and the others subsequently returned to Santa Maria due to the high police presence. Ricardo said they did not "make soup" because the weather was "really hot."

*Arrests, Searches, And Seizures*

On March 3, 2016, appellants and their codefendants were arrested, their residences were searched, and various items were seized, including 40 cellphones. Items found in Ricardo's bedroom included 10 rounds of loose .38-special ammunition in a box behind a dresser and a jersey with the number "13" on it. The items recovered from a trash bag next to Hernandez's bed included a CZ 75B semiautomatic handgun (Gun 2) loaded with two different brands of ammunition and a belt with the number "13" on it. In Hernandez's bedroom and closet the police also found a .40-caliber magazine in a shoe, three rounds of ammunition for a .45-caliber and .30-caliber firearm in a sock, and two boxes of 9-millimeter and .38-special ammunition in a paper bag with a receipt showing they were purchased in Bakersfield on October 11, 2015. An expended .38-caliber bullet casing was recovered from a waste basket in a bathroom.

At the residence shared by Juan Serrano and Luis, the police seized a loaded 9-millimeter semiautomatic pistol (Gun 1) that was wrapped in a plastic bag and hidden in a toilet tank in a bathroom. The police also recovered what appeared to be marijuana, mini baggies with marijuana leaves in them, a digital scale, a box containing 16 rounds of 9-millimeter ammunition,

26

and a sock containing two 9-millimeter cartridges and two .38-special cartridges.  Samples from the rear interior of a silver-gray Toyota Camry at the property tested positive for gunshot residue.  A 9-millimeter expended casing was also found in the "windshield wiper pocket" area of the engine compartment.  A sample obtained from the driver's side door window of Marcos Torres's black Honda Civic also tested positive for gunshot residue.

*DNA Evidence*

Based on DNA analysis, it was determined there were at least two contributors to the DNA mixture found on Gun 1's grip trigger and safety buttons, and four contributors to the mixture found on the magazine.  There was "very strong" support for the conclusion that Juan Serrano was a contributor to the DNA mixture obtained from Gun 1's grip, trigger and safety buttons, and "strong" support for the conclusion that Olvin Serrano was a contributor to the same mixture.  There was "very strong support" for the conclusion that Hernandez was a contributor to the DNA mixture obtained from Gun 1's magazine; the likelihood that Hernandez and three unknown individuals were contributors to the DNA mixture was "approximately 110 billion times more likely" than if four unknown individuals were the contributors.  There was "[no] support" for the inclusion of Balmore or Ricardo.

*Ballistics Evidence*

Tracy Peck, a senior criminalist, with the Los Angeles County Sheriff's Department, testified as the prosecution's firearms and toolmark expert.  After analyzing and comparing the ballistics evidence, Peck opined that a total of seven firearms, three of which were recovered, were used in the shootings.

Gun 1, which was found at the residence of Juan Serrano and Luis, was used in the December 4, 2015 shooting of Brayan and the January 2, 2016 shootings of Murillo-Sanchez and Hernandez-Sanchez. Gun 2, which was found at Hernandez's residence, was used in the May 16, 2015 shooting of Modesto. A Glock 9-millimeter semiautomatic pistol (Gun 4), which was recovered on November 17, 2015 from a vehicle linked to Soriano, was used in the July 28, 2015 shooting of Joaquin and the September 28, 2015 shootings of Martinez, Castillo, and Alfaro. A 9-millimeter pistol (Gun 5), which was not recovered, was used in four of the shootings. The same pistol also fired the 9-millimeter cartridge casing found in the Toyota Camry at Juan Serrano and Luis's residence.

*Defense Evidence*

Ricardo did not present any evidence on his own behalf. Hernandez presented the testimony and report of Benjamin Rose, an expert in digital forensics and electronic discovery. Among other things, Rose testified that some of the prosecution's cellphone evidence showed Hernandez's phone was not at or near the location of the crimes at the times they were committed, and that the software he used to map the cell tower sites upon which the prosecution's evidence was based provided a more accurate location of those sites.

Balmore presented the testimony of gang expert Martin Flores. Flores testified among other things that gang members often "brag, exaggerate, [and] make up stories" about their clique. Flores also testified that young people who are not gang members have embraced the culture and that many famous rappers have rapped about fabricated incidents of crime and violence.

28

*Appellants' Convictions And Sentences*

The jury found Balmore guilty on 3 counts of first degree murder (counts 16, 18, and 40), 5 counts of conspiracy to commit murder (counts 1, 5, 6, 19, and 20), and 17 counts of criminal street gang conspiracy to commit murder (counts 7, 10, 11, 14, 15, 17, 21-23, 26, 31-33, 37-39, and 41). As to the murders, the jury found true special-circumstance allegations of multiple murder (§ 190.2, subd. (a)(3)), lying-in-wait (*id.*, subd. (a)(15); counts 16 and 40), and gang murder (*id.*, subd. (a)(22)). The jury also found true allegations as to the murder and conspiracy to commit murder counts that the crimes were committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(4)), and that a principal intentionally discharged a firearm causing death (§ 12022.53, subds. (d) & (e)). Balmore was found not guilty of first degree murder in counts 8, 9, 12, 13, 24, and 34, and not guilty of conspiracy to commit murder in counts 2 through 4, 25, 28 through 30, 35, and 36. The trial court sentenced him to a total state prison term of 385 years to life plus three consecutive LWOP terms.

Hernandez was found guilty on 4 counts of first degree murder (counts 8, 9, 12, and 13), 6 counts of conspiracy to commit murder (counts 1, 5, 6, 28-30), and 13 counts of criminal street gang conspiracy (counts 7, 10, 11, 14, 15, 17, 21-23, 26, and 31-33). As to the murders, the jury found true special-circumstance allegations of multiple murder, lying-in-wait (counts 8 and 9), and gang murder. The jury also found true allegations as to the murder and conspiracy to commit murder counts that the crimes were committed for the benefit of a criminal street gang and that a principal intentionally discharged a firearm causing death. Hernandez was found not guilty of first degree murder in counts

29

18, 24, 34, and 40, not guilty of conspiracy to commit murder in counts 2 through 4, 19, 20, 25, 35, and 36, and not guilty of criminal street gang conspiracy in counts 37 through 39 and 41. The court sentenced him to a total term of 339 years to life plus four consecutive LWOP terms.[14]

Ricardo was found guilty on 7 counts of first degree murder (counts 8, 9, 12, 3, 16, 18, 40), 8 counts of conspiracy to commit murder (counts 1, 5, 6, 19, 20, 28-30), and 17 counts of criminal street gang conspiracy (counts , 10, 11, 14, 15, 17, 1-23, 26, 31-33, 37-39, 41). The jury also found gang and firearm allegations true as to the murder and conspiracy to commit murder counts. Ricardo was found not guilty of first degree murder in counts 24 and 34, and of conspiracy to commit murder in counts 2 through 4, 25, 35, and 36. The court sentenced him to a total term of 439 years to life plus seven consecutive LWOP terms.

The trial court also ordered each appellant to pay a $10,000 restitution fine (§ 1202.4, subd. (b)), imposed and stayed parole revocation fines (§ 1202.45) in the same amount, ordered each of them to pay court operations and court facilities assessments (§ 1465.68; Gov. Code, § 70373), and awarded presentence custody credit.

---

[14] As the People note, Hernandez's minute order erroneously states that he was sentenced to an aggregate term of 225 years to life plus 4 consecutive LWOP terms. We shall order the minute dear corrected to accurately reflect the court's oral pronouncement of sentence. (See *People v. Mitchell* (2001) 26 Cal.4th 181, 185.)

*Contentions*[15]

I.

Batson/Wheeler *Motion; Code Civ. Proc. § 231.7*

Appellants contend the trial court erred in allowing the prosecution to exercise a peremptory challenge against a prospective juror with Hispanic ethnicity (Prospective Juror No. 7). They claim the court erred in concluding that recently enacted Code of Civil Procedure section 231.7 (hereinafter section 231.7) did not apply to the case, and that the court in any event erred in denying their motion to exclude Prospective Juror No. 7 pursuant to *Batson v. Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69] and *People v. Wheeler* (1978) 22 Cal.3d 258. Ricardo also contends that his trial attorney provided ineffective assistance of counsel (IAC) by failing to urge the court to apply section 231.7.

We agree with the trial court's conclusions that section 231.7 did not apply to this case and that appellants failed to make a prima facie showing that Prospective Juror No. 7 was

[15] Appellants purport to join in each other's arguments. "While we note these joinders, they are not well taken to the extent [appellants] have failed to argue a miscarriage of justice in each individual circumstance." (*People v. Nilsson* (2015) 242 Cal.App.4th 1, 12, fn. 2.) "Appellate counsel for the party purporting to join some or all of the claims raised by another are obligated to thoughtfully assess whether such joinder is proper as to the specific claims and, if necessary, to provide particularized argument in support of his or her client's ability to seek relief on that ground. If a party's briefs do not provide legal argument and citation to authority on each point raised, ' "the court may treat it as waived, and pass it without consideration. . . ." ' " (*People v. Bryan, Smith and Wheeler* (2014) 60 Cal.4th 335, 363-364 (*Bryan*).)

excluded on account of her Hispanic ethnicity.  Accordingly, the court did not err in denying appellants' *Batson*/*Wheeler* motion.

" 'Review of a trial court's denial of a *Wheeler/Batson* motion is deferential, examining only whether substantial evidence supports its conclusions.  [Citation.]  "We review a trial court's determination regarding the sufficiency of a prosecutor's justifications for exercising peremptory challenges ' "with great restraint." ' [Citation.]  We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses.  [Citation.]  So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal.  [Citation.]" ' [Citation.]" (*People v. Jimenez* (2024) 99 Cal.App.5th 534, 547 (*Jimenez*.)

"Under *Batson/Wheeler* jurisprudence, ' "[t]here 'is a rebuttable presumption that a peremptory challenge is being exercised properly, and the burden is on the opposing party to demonstrate impermissible discrimination.' " ' [Citation.]" (*Jimenez, supra*, 99 Cal.App.5th at pp. 547-548.)  Under a three-step process, a defendant must first " ' "make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.' " ' [Citation.]  In this step, the party opposing the peremptory challenge must provide ' " 'evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred.' " ' [Citation.]" (*Id.* at p. 548.)  If the trial court finds the defendant failed to set forth a prima facie case of discrimination and the reviewing court agrees, "the claim is resolved" on appeal.  (*People v. Scott* (2015) 61 Cal.4th 363, 391 (*Scott*); see also *People v. Farnam* (2002) 28

32

Cal.4th 107, 135 ["[I]f we find that the trial court properly determined that no prima facie case was made, we need not review the adequacy of the prosecution's justifications, if any, for the peremptory challenges"].) A trial court's finding on this issue must be upheld if supported by substantial evidence. (See *Farnam*, at p. 136.)

On January 1, 2021, the Legislature enacted Assembly Bill No. 3070 (2019–2020 Reg. Sess.) to add section 231.7, which creates new procedures for identifying unlawful discrimination in the use of peremptory challenges. The new law, by its express terms, "applies in all jury trials in which jury trial selection begins on or after January 1, 2022." (§ 231.7, subd. (i); Stats. 2020, ch. 318, § 2.) "Under section 231.7, the party objecting to the peremptory challenge is no longer required to make a prima facie showing of racial discrimination. Instead, 'upon objection to the exercise of a peremptory challenge pursuant to [section 231.7],' the party exercising the peremptory challenge must state the reasons for exercising the challenge. [Citation.] Also, certain reasons for a peremptory challenge are presumptively invalid under section 231.7 unless rebutted by clear and convincing evidence that they are unrelated to the prospective juror's perceived membership in a protected group and that the reasons bear on the juror's ability to be fair and impartial. [Citation.]" (*People v. Jaime* (2023) 91 Cal.App.5th 941, 943, fn. omitted.)

As we have noted, section 231.7 applies to "jury trials in which jury selection begins on or after January 1, 2022." (*Id.,* subd. (i).) Appellants acknowledge that jury selection in this case began on November 1, 2021, when the prospective jurors were given written questionnaires to fill out. (See *People v. Peterson* (2020) 10 Cal.5th 409, 428 [recognizing in the context of a capital

33

case that "[j]ury selection . . . typically begins with prospective jurors filling out written questionnaires"].) Because jury selection did not begin on or after January 1, 2022, the trial court correctly concluded that section 231.7 did not apply. It is of no moment that jury selection was still underway as of that date. If the Legislature had intended for the statute to apply in these circumstances, it would have said so.

We reject appellants' assertion that the "spirit" of section 231.7 compels us to disregard the statute's plain and express language regarding the date of its application. (See *In re Ge.M.* (1991) 226 Cal.App.3d 1519, 1522-1523, citation omitted ["The court will decline to follow the plain meaning of a statute only when to do so would inevitably frustrate the manifest purposes of the legislation as a whole"].) The statute was enacted on January 1, 2021, yet the Legislature expressly determined that the statute only applies to cases in which jury selection began on or after January 1, 2022.

Following appellants' logic, to conform with the "spirit" of section 231.7 the law would have to be applied to all trials in which jury selection began prior to January 1, 2022, but was still underway as of that date. The legislative history makes clear, however, that such a construction was deliberately rejected. As first introduced, Assembly Bill No. 3070 stated that the law would apply to any trial "in which jury selection has not been completed as of January 1, 2021." (Assem. Bill No. 3070 (2019-2020 Reg. Sess.) § 2.) The bill was subsequently amended to apply to trials in which jury selection "begins on or after April. 1, 2021." (Assem. Bill No. 3070 (2019-2020 Reg. Sess.) Aug. 13, 2020.) A week later, the language was amended again to state that the new law only applies to trials in which jury selection

34

begins on or after January 1, 2022. (Assem. Bill No. 3070 (2019-2020 Reg. Sess.) Aug. 20, 2020.) It is thus clear that the Legislature did not intend for the statute to apply to trials—such as appellants'—in which jury selection began prior to January 1, 2022 but had not been completed as of that date. Contrary to appellants' claim, we "may not speculate that [the] Legislature meant something other than what it said[.]" (*People v. Schoop* (2012) 212 Cal.App.4th 457, 470, citing *Mutual Life Ins. Co. v. City of Los Angeles* (1990) 50 Cal.3d 402, 412.)

Although the literal meaning of words in a statute " ' " ' "may be disregarded to avoid absurd results," ' " ' " courts should do so only " 'in " '*extreme* cases . . . .' " ' [Citation.]" (*People v. Morales* (2019) 33 Cal.App.5th 800, 806.) " 'To justify departing from a literal reading of a clearly worded statute, the results produced must be so unreasonable the Legislature could not have intended them.' [Citation.] Such is not the case here." (*People v. Alaybue* (2020) 51 Cal.App.5th 207, 224.) Accordingly, the court properly found that section 231.7 did not apply. It necessarily follows Ricardo's claim that his attorney provided IAC by failing to object otherwise fails for lack of prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688, 693-694 (*Strickland*).)[16]

---

[16] Ricardo's request for judicial notice of five articles is denied. He did not ask the trial court to take judicial notice of the two articles he offers as support for his claim that the court was required to apply Code of Civil Procedure section 231.7 in adjudicating his objection to the peremptory challenge of Prospective Juror No. 7. (See *People v. Hardy* (1992) 2 Cal.4th 86, 134 [" '[A]s a general rule the [appellate] court should not take . . . [judicial] notice if, upon examination of the record, it appears that the matter has not been presented to and

Substantial evidence also supports the court's finding that appellants failed to meet their burden of setting forth a prima facie case on their *Batson/Wheeler* motion. In denying the motion at the first stage, the court properly found there was no evidence the prosecutor was excusing a group of people based on their race or ethnicity and that the prosecutor had asked numerous questions of Prospective Juror No. 7.

As appellants acknowledge, Prospective Juror No. 7 was the only Hispanic person against whom the prosecutor had exercised a peremptory challenge and the jury panel included other individuals who identified as having Hispanic ethnicity. "Although circumstances may be imagined in which a prima facie case could be shown on the basis of a single excusal, in the ordinary case, including this one, to make a prima facie case after the excusal of only one or two members of a group is very difficult. [Citation.]" (*People v. Bell* (2007) 40 Cal.4th 582, 598, fn. 3, disapproved on other grounds in *People v. Sanchez* (2016) 63 Cal.4th 665, 686.) Indeed, it is " ' "impossible," ' " as a practical matter, to draw the requisite inference [of discrimination] where only a few members of a cognizable group have been excused and no indelible pattern of discrimination appears. [Citations.]" (*People v. Garcia* (2011) 52 Cal.4th 706, 747; see also *People v. Bonilla* (2007) 41 Cal.4th 313, 342-343 [trial court properly found no prima facie case of discrimination where the prosecutor

_____

considered by the trial court in the first instance' "].) In any event, neither article supports the proposition for which it is offered. Ricardo's request for judicial notice of one of the same articles and an additional three articles as support for his claim that Evidence Code section 352.2 applies retroactively is denied as moot in light of our Supreme Court's recent holding to the contrary. (See *post,* pp. 59-60.)

36

excused the only two African-Americans in a 78-person jury pool].)

Here, the prosecutor also went on to note that "[b]oth the victims in this case and the defendant[s] are of the same race. Hispanic jurors could just as easily relate to or empathize with the victims as [the] defendants, therefore any sort of alleged racial-based exclusion by the People would make no logical sense." The prosecutor added that "we did not exercise the peremptory challenge [against Prospective Juror No .7] for race-based reasons, but because of the juror's answers which led us to believe she sympathizes with gang members and criminal activity." The court found that this statement "appears to the court to be reasonable and is not a mere pretext." (See *People v. Rushing* (2011) 197 Cal.App.4th 801, 811 [expression of sympathy toward gang members was a valid race-neutral reason for exercising peremptory challenge].) Because substantial evidence supports the court's finding that no prima facie case of discrimination was established, appellants' *Batson/Wheeler* motion was properly denied at the first stage. (*Scott*, *supra*, 61 Cal.4th at p. 391.)

## II.
### *Sufficiency Of The Evidence*
#### a. *Hernandez - Conspiracy To Commit Murder (§ 182)*

Hernandez challenges the sufficiency of the evidence to support his convictions on counts 28, 29, and 30 for conspiracy to commit the first degree murders of Martinez, Castillo and Alfaro. He contends there is no evidence from which the jury could have reasonably found he had the specific intent to agree to kill the victims and to commit those killings. We are not persuaded.

37

" 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence — that is, evidence that is reasonable, credible, and of solid value — from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.] We determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citation.] This determination 'presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' [Citation.]" (*People v. Cardenas* (2025) 18 Cal.5th 797, 821 (*Cardenas*).) "Reversal on this ground is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

"Conspiracy ' "is an inchoate offense, the essence of which is an agreement to commit an unlawful act." ' [Citation.] This crime has four elements: (1) the existence of an agreement between at least two persons; (2) the specific intent to agree to commit an offense; (3) the specific intent to commit the offense that is the object of the agreement; and (4) an overt act in furtherance of the conspiracy, which may be committed by any conspirator. [Citations.]" (*People v. Ware* (2022) 14 Cal.5th 151, 163 (*Ware*).)

"While it may be useful to show the precise role the defendant intended to play in achieving the object of the conspiracy, the prosecution is not required to establish precisely

how the defendant intended to achieve the ends of the conspiracy or that the defendant's chosen means were effective in achieving those ends.  Nor, certainly, must the prosecution establish the intent to participate in every act necessary to complete the object offense.   [Citation.]  But ultimately, to connect any individual to the charged conspiracy, the prosecution must at least establish that the individual specifically intended to agree to commit the criminal offense and to play at least some role in achieving it. [Citation.]" (*Ware, supra,* 14 Cal.5th at pp. 166–167.)  The trier of fact may infer that a conspiracy exists " ' " 'from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy.' " ' " (*People v. Navarro* (2021) 12 Cal.5th 285, 302-303.)

The evidence is sufficient to support Hernandez's convictions for conspiracy to commit the murders of Martinez, Castillo and Alfaro.  Hernandez's arguments to the contrary fail to account for the standard of review, which requires us to view the evidence in the light most favorable to the judgment. (*Cardenas, supra*, 18 Cal.5th at p. 821.)  Hernandez admits he was a member of SMLS'LS when Martinez, Castillo and Alfaro were shot, and substantial evidence supports the jury's finding that he conspired with his fellow gang members to commit those shootings with the requisite intent to kill.  The evidence at trial set forth a longstanding modus operandi in which members of the gang sought out rivals or perceived rivals, collectively conducted surveillance of their intended victims with multiple vehicles, and frequently exchanged information with each other by phone as they determined when and where to carry out their crimes.

The evidence also established that Hernandez and his fellow gang members employed this modus operandi in planning

39

and carrying out the murders of Martinez, Castillo, and Alfaro. The cellphone usage of Hernandez and seven of his co-conspirators was consistent with all of them being in the vicinity of the crime scene when the 911 call regarding the shootings was made at 11:21 p.m. Contrary to Hernandez's claim, the lack of any direct evidence that he had possession of his phone that night did not preclude such a finding based on the circumstantial evidence evaluated under the totality of the circumstances. Hernandez and his co-conspirators made multiple calls to each other immediately after the 911 call, which supports an inference that they were confirming the murders had been committed. And when Hernandez was arrested, he was found in possession of the gun used to kill Modesto under the same modus operandi. In light of this evidence, the jury could reasonably find that Hernandez "had the specific intent to agree to kill and the specific intent to commit killings, whether personally or by playing a role in killings carried out by others." (*Ware*, *supra*, 14 Cal.5th at p. 167.)

Hernandez's reliance on *Ware*, *supra*, 14 Cal.5th 151, is unavailing. In that case, our Supreme Court concluded that the defendant's "membership in a group with violent aims and his association with individuals who commit violent crimes" was insufficient to support a finding that he specifically intended to commit murder or to enter an agreement to commit murder. (*Id.* at p. 174.) The alleged object of the conspiracy was a "nonspecific" agreement to kill rival gang members. (*Id.* at p. 163.) Here, the evidence at trial was sufficient to connect Hernandez's conduct and mental state specifically to the murders of Martinez, Castillo and Alfaro and does not merely concern his gang membership. Hernandez's claim that the evidence is

40

insufficient to support his convictions for conspiring to commit those murders, thus fails.

b. *Hernandez - Criminal Street Gang Conspiracy (§182.5)*

Hernandez contends the evidence is also insufficient to support his convictions under section 182.5 for active participation in a criminal street gang conspiracy to commit the first degree murders of Molina (count 17); Garcia-Mendez, Gonzalez and Rojas (counts 21 through 23); Abrahan (count 26); and Martinez, Castillo and Alfaro (counts 31 through 33). We reject this contention as well.

"Section 182.5 created a new form of conspiracy that is distinct from the traditional understanding of the crime[.]" (*People v. Johnson* (2013) 57 Cal.4th 250, 261 (*Johnson*).) The statute provides: "[A]ny person who actively participates in any criminal street gang . . . with knowledge that its members engage in or have engaged in a pattern of criminal gang activity . . . and who willfully promotes, furthers, assists, or benefits from any felonious criminal conduct by members of that gang is guilty of conspiracy to commit that felony and may be punished as specified in subdivision (a) of Section 182." (§ 182.5.)

Gang conspiracy under section 182.5 differs from traditional criminal conspiracy in five ways. (*Johnson, supra*, 57 Cal.4th at pp. 261-262.) First, the defendant "must be an active gang participant with knowledge of other members' pattern of criminal gang activity." (*Id.* at p. 262.) Second, a gang conspiracy requires the commission or attempted commission of felonious criminal conduct. (*Ibid.*) Third, a gang conspiracy does not require any prior agreement among the conspirators to promote, further, or assist in the commission of a particular target crime. Accordingly, "an active and knowing gang

41

participant who acts with the required intent to promote, further, or assist in the commission of a felony by other gang members can violate section 182.5." (*Ibid.*) Fourth, a gang conspiracy "requires the actual commission of felonious criminal conduct as either an attempt or a completed crime." (*Ibid.*) Fifth, a gang conspiracy includes "not only a gang member who promotes, furthers, or assists in the commission of a felony, [but also] an active and knowing participant who merely benefits from the crime's commission, even if he or she did not promote, further, or assist in the commission of that particular substantive offense." (*Ibid.*) The court explained, "[d]ue to the organized nature of gangs, active gang participants may benefit from crimes committed by other gang members. When such benefits are proven along with the other elements of the statute, section 182.5 permits those benefitting gang participants to be convicted of conspiracy to commit the specific offense from which they benefitted." (*Ibid.*)

Sufficient evidence supports Hernandez's convictions for criminal street gang conspiracy to commit the murders of Molina, Garcia-Mendez, Gonzalez, Rojas, Abrahan, Martinez, Castillo and Alfaro. In arguing otherwise, Hernandez again gives short shrift to the standard of review, which compels us to view the evidence in the light most favorable to the judgment. Contrary to his claim, the evidence overwhelmingly supports the finding that he was an active participant in SMLS'LS at all relevant times and knew the members of the gang engaged in or had engaged in a pattern of criminal activity. Among other things, Hernandez does not challenge any of the gang enhancements found true as to multiple counts of which he was convicted. There was also evidence to support the jury's finding that he willfully promoted,

42

furthered, or assisted in the felonious conduct upon which his convictions under section 182.5 are based. Hernandez's gang employed the same modus operandi in committing all the crimes and he participated in the phone calls and/or text messages preceding and following each of those crimes while in the vicinity of their commission. His claim that the evidence is insufficient to support the challenged convictions accordingly fails.

c. *Balmore – Criminal Street Gang Conspiracy*

Balmore fares no better in contending the evidence is insufficient to support his conditions for criminal street gang conspiracy to commit the first degree murders of Montano-Barajas and Morales-Suarez (counts 10 and 11); Murillo-Sanchez and Hernandez-Sanchez (counts 14 and 15); Abrahan (count 26); Martinez, Castillo and Alfaro (counts 31 through 33); and Joaquin, Ranmarine and Cantu (count 37 through 39). He does not dispute the evidence of his active gang membership and fails to undermine the ample evidence of his participation in the modus operandi employed to commit each of the crimes of which he was convicted. Although he notes that the evidence indicates he only participated in one phone call on the night that Montano-Barajas and Morales-Suarez were murdered, under the totality of the circumstances that evidence supported an inference that he thereby willfully promoted, furthered, or assisted in the commission of the murders.

Balmore's attempts to diminish the evidence that his Toyota Corolla was one of the gang's known vehicles "casing" the area prior to the shootings of Martinez, Castillo and Alfaro are similarly unavailing. As the People persuasively argue, "[e]ven assuming Balmore was not the one driving the Corolla, there was evidence that vehicles associated with the members were shared

43

amongst the members. . . . Evidence that Balmore permitted the gang to use the car for the attack indicates he willfully furthered or assisted in the gang's attempted murder of Martinez, Castillo, and Alfaro." Balmore's claim of insufficient evidence thus fails.

## III.

*Jury Instruction On Criminal Street Gang Conspiracy (§ 182.5)*

Appellants contend the trial court misinstructed the jury on the crime of criminal street gang conspiracy, as set forth in section 182.5. They claim the court prejudicially erred in failing to instruct that they could be found to have "willfully benefitted" from their fellow gang members' felonious criminal conduct only if they "ha[d] knowledge" of that conduct "prior to or during the commission of the charged offense." (Italics omitted.) We are not persuaded.

The trial court has a sua sponte duty to instruct the jury on all elements of any charged offense. (*People v. Mil* (2012) 53 Cal.4th 400, 409.) This duty extends to the general principles of law that govern the case, i.e., those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case. (*People v. Michaels* (2002) 28 Cal.4th 486, 529-530.) Pinpoint instructions connect specific facts to a legal issue involved in the case. (*People v. Lujano* (2017) 15 Cal.App.5th 187, 191.) Such instructions are required to be " ' "given upon request when there is evidence supportive of the theory. . . ." ' " (*Ibid.*) But "[i]t is error to give an instruction which, while correctly stating a principle of law, has no application to the facts of the case." (*People v. Guiton* (1993) 4 Cal.4th 1116, 1129.)

We review claims of instructional error de novo. (*People v. Parker* (2022) 13 Cal.5th 1, 66.) We consider the challenged

44

instruction " 'in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner.' " (*People v. Rivera* (2019) 7 Cal.5th 306, 326.)  And we " 'assume that jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given.' " (*People v. Richardson* (2008) 43 Cal.4th 959, 1028, superseded by statute on another ground as stated in *People v. Nieves* (2021) 11 Cal.5th 404, 509.)  We also consider the arguments of counsel in assessing the potential impact of an instruction on the jury. (*People v. Young* (2005) 34 Cal.4th 1149, 1202.)

Balmore submitted a proposed jury instruction for section 182.5, for which there is no pattern instruction.  He asserted that section 182.5 "must be construed to require the defendant to 'willfully' benefit from and have knowledge of the charged felony offense committed by the gang members at the time the felony is committed."  Balmore proposed the following:  "To prove that the defendant is guilty of violating Penal Code section 182.5, the prosecution must prove that:  [¶]  1.  The defendant actively participated in a criminal street gang; [¶]  2.  When the defendant participated in the gang, he had knowledge members of the street gang engaged in, or had engaged in, a pattern of criminal activity;  [¶]  3.  The defendant willfully promoted, furthered, and assisted in the felony offense charged in counts ___, by directly and actively committing the charged felony offense or by aiding and abetting the charged felony offense.  [¶] AND  [¶]  4.  A member of the gang committed or attempted to commit the felony. . . .  In order [to] 'willfully' promote, further, assist, or benefit, the defendant must have knowledge prior to or during the commission of the charged offense.  [¶] . . . [¶]  As the

45

term is used here, a willful act is one done willingly or on purpose. To do an act willfully is to do it knowingly."

The prosecution filed an opposition to Balmore's proposed instruction. The prosecution asserted among other things that the proposed instruction omitted the element that a defendant can be found guilty if he "benefitted" from the underlying felony offense and erroneously required findings that the defendant (1) directly committed or aided and abetted the underlying felony offense; and (2) had knowledge of the felony at the time it was committed.

The prosecution proposed the following instruction: "The defendants are charged . . . with criminal street gang conspiracy. [¶] To prove that a defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant actively participated in a criminal street gang; [¶] 2. When the defendant participated in the gang, he knew that members of the gang engage in or have engaged in a pattern of criminal gang activity; [¶] 3. The defendant willfully promoted, furthered, assisted, or benefitted from any felonious criminal conduct by members of that gang: [¶] AND [¶] 4. Members of that gang committed or attempted to commit the felony. [¶] . . . [¶] As the term is used here, a *willful act* is one done willingly or on purpose. [¶] To do a thing willfully is to do it knowingly." Following off-the-record discussions regarding jury instructions, the court instructed the jury as proposed by the prosecution.

The court did not err. As the prosecution noted, Balmore's proposed instruction was legally incorrect. Moreover, appellants offer no meaningful support for their assertion that a gang member cannot be found to have "willfully benefitted" from a felony offense of which he or she had no knowledge prior to or

46

during the commission of that offense. *People v. Abbate* (2020) 58 Cal.App.5th 100, does not so hold. In that case, the defendant argued that section 182.5 violates due process because it "punishes a defendant for willfully benefitting 'without knowledge that the benefit received came as a result of criminal gang conduct.' " (*Abbate*, at p. 113.) In rejecting this argument, the court of appeal reasoned that a defendant who willfully benefits from felonious gang conduct "impliedly knew that he or she reaped a benefit from that conduct." (*Ibid.*)

As the People note, "the knowledge requirement in 'willfully benefits' applies to whether the defendant knew he or she received a benefit from the felonious gang conduct. It does not further require that the defendant knew of the conduct before he knowingly received the benefit." Moreover, it is conceivable that a gang member could willfully benefit from felonious conduct of which he or she had no prior or contemporaneous knowledge. For example, an individual could be found to have willfully benefitted from his gang's sale of drugs by receiving and accepting money he knew was obtained through individual sales of which he had no actual knowledge.

In any event, the prosecution did not urge the jury to convict appellants on the mere finding that they "willfully benefitted" from the crimes upon which their criminal street gang conspiracy convictions are based. Rather, the prosecution asserted that appellants willfully promoted, furthered, and assisted the underlying felonious conduct. As Ricardo's attorney asserted without objection in his closing argument, on these theories "[k]nowledge after the fact is not enough to get to you criminal street gang conspiracy." Counsel also argued without objection that in order to find Ricardo guilty of criminal street

47

gang conspiracy under section 182.5 "[t]he prosecution must show a gang-related felony or that he aided and abetted a felony committed by gang members and he must do so knowingly, not simply benefit after the fact." Appellants' claim of instructional error accordingly fails.

IV.

*Ricardo's Wrist Restraint*

Ricardo contends the trial court abused its discretion in ordering his left wrist to be restrained during trial. We disagree.

Prior to trial, the sheriff's office filed a motion requesting an order that Ricardo be physically restrained during trial with leg shackles and a restraint on his left wrist. The court granted the motion, which set forth the requisite showing of a manifest need for the restraints. (See *People v. Ward* (2005) 36 Cal.4th 186, 206.) Among other things, while in jail Ricardo had been involved in a gang-related assault. (See, e.g., *People v. Young* (2019) 7 Cal.5th 905, 934 [manifest need for restraints can be established "with ' "evidence that the defendant . . . threatened or assaulted other inmates . . ." ' "].) Accordingly, the court did not abuse its discretion in ordering the restraint of Ricardo's left wrist during trial. (*People v. Virgil* (2011) 51 Cal.4th 1210, 1270.) Ricardo does not challenge the decision to shackle his legs.

In any event, any error in ordering that Ricardo's wrist be restrained would be harmless because the record contains no evidence the restraint was visible to the jury or that it prejudiced his right to testify or participate in his defense. (*People v. Poore* (2022) 13 Cal.5th 266, 288-289.) Trial counsel's remark that some of the jurors might be able to see the wrist restraint was mere speculation. (*People v. Amezcua and Flores* (2019) 6 Cal.5th 886, 910-911; see also *Bryant, supra,* 60 Cal.4th at p. 392 ["the

possibility that some jurors may have perceived defendants were wearing some type of device does not establish a constitutional violation"].)  The trial court stated "I don't believe the custody status is revealed" by the wrist restraint.  When physical restraints are visible to the jury, the trial court has a sua sponte duty to instruct the jury with CALCRIM No. 204.  (See *People v. Jacobs* (1989) 210 Cal.App.3d 1135, 1140.)  Ricardo, however, does not contend the court erred in failing to give the instruction.  Moreover, the evidence at trial of Ricardo's "violent tendencies . . . was far stronger than any inference the jury might have drawn from the [wrist restraint] regarding his dangerous character."  (*People v. Miracle* (2018) 6 Cal.5th 318, 350.)  Ricardo's claim thus fails for lack of prejudice.

V.

*Firearm/Toolmark Expert Testimony*

a.  *Expert Peck*

Appellants contend the trial court failed to exercise its gatekeeping duty to limit the testimony of Tracy Peck, the prosecution's firearms and toolmark expert, as provided in *People v. Azcona* (2020) 58 Cal.App.5th 504 (*Azcona*).  We are not persuaded.

Prior to trial, Hernandez moved in limine to exclude or limit Peck's testimony.  The motion alleged among other things that firearm comparison evidence is not generally accepted in the scientific community.  Hernandez requested that Peck be precluded from testifying "that the bullets from [multiple] crime scenes were fired from a single weapon" or that she be limited to stating that "bullets from the multiple crime scenes are consistent and could have been fired from [an] identifiable

49

weapon[.]" Balmore and Ricardo subsequently joined in the motion.

The prosecutor offered that Peck would be testifying, in accordance with the recommendations of the Association of Firearm and Toolmark Examiners (AFTE) and the Department of Justice, that "she would not exclude as to any other firearms" and would "not quantify her opinion in any such way." The court denied the motion.

In her testimony at trial, Peck stated that her opinions regarding firearms used in the shootings were not "to the exclusion of every firearm in the world." Peck also agreed there is "some level of subjectivity in the examination of firearm evidence" and that her opinions were subjective. She made clear that there was no statistical certainty to her opinions.

The court did not err in declining to limit Peck's testimony as requested by appellants. Evidence Code sections 801 and 802 require the trial court to act as a gatekeeper to prevent the jury from hearing unreliable expert opinions. (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 769, 771.) The court's decision on this issue is reviewed for an abuse of discretion (*id.* at p. 773), and there was no abuse of discretion here.

*Azcona*, on which appellants rely, is inapposite. In *Azcona*, the firearm expert testified that bullet casings were fired from the same gun " 'to the practical exclusion of all other guns.' " (*Azcona, supra*, 58 Cal.App.5th at p. 510.) The defendant had also unsuccessfully objected to the expert's testimony at a hearing held under *People v. Kelly* (1976) 17 Cal.3d 24. After acknowledging our Supreme Court's holding that *Kelly* did not apply to a similar method of firearm toolmark examination, the

50

court of appeal found the defendant had in any event failed to meet his burden of showing that a clear majority of the scientific community no longer accepted the technique as reliable. (*Azcona,* at pp. 511-513, citing *People v. Cowan* (2010) 50 Cal.4th 401.)

The court of appeal also found, however, that the trial court had failed to comply with its gatekeeping duty to ensure that the expert's opinion was supported by material upon which the expert relied. (*Azcona, supra,* 58 Cal.App.5th at p. 513.) The court noted that evidence presented by the defense at the *Kelly* hearing "should have prompted the trial judge "to carefully determine what conclusions can reliably be drawn from the methodology in question." (*Id.* at p. 513.) The expert's testimony that the bullet casings came from the same gun " 'to the practical exclusion of all other guns' " amounted to "unfettered expert testimony that went [well] beyond what the underlying material supported." (*Id.* at pp. 513-514.) The court reasoned: "There was support for the opinion that the projectiles likely came from the same gun, perhaps more likely than not, but there was no basis to present it as a scientific certainty. The trial court abused its discretion by failing to limit the expert's opinion to what was actually supported by the material the expert relied on." (*Id.* at p. 514.)

*Azcona* does not support appellants' claim. Contrary to the expert in *Azcona*, Peck made clear that her opinions were subjective and were not stated to a scientific certainty or to the exclusion of all other guns. As the People note, the methodology employed by Peck—which involved the microscopic comparison of a totality of the visual characteristics found on the projectiles— was also "more robust . . . than the limited striation analysis" applied in *Azcona.* (See *Azcona, supra,* 58 Cal.App.5th at p. 512.)

Moreover, appellants requested that Peck be limited to stating that "bullets from the multiple crime scenes are consistent and could have been fired from an identifiable weapon." Although Peck did not state her opinions to this limited degree, she made clear those opinions were not scientifically certain and were also subjective. Moreover, appellants each had the opportunity to cross-examine Peck regarding her opinions. We also agree with the People that the evidence of appellants' guilt, independent of ballistics and firearms evidence, is strong. Because it is not reasonably probable that the result of the proceedings would have been different had the court limited Peck's testimony as requested by appellants, any error in failing to so limit that testimony was harmless. (*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*); *People v. Pearson* (2013) 56 Cal.4th 393, 446 [applying *Watson* harmless error analysis to erroneously admitted expert testimony].)

Again, relying on *Azcona*, appellants also contend that Peck's testimony regarding peer review of her work was testimonial hearsay admitted in violation of the federal confrontation rights. (See *Azcona*, *supra*, 58 Cal.App.5th at p. 514.) As the People note, appellants did not object to that testimony, which was actually elicited by Balmore and Hernandez's counsel. Because there was no objection, the contention is forfeited. (*People v. Jennings* (2010) 50 Cal.4th 616, 654.)

We reject appellants' alternative contention that their attorneys' failure to object amounts to IAC. Even if counsel's failure to object constituted deficient performance, it is not reasonably probable that any of the appellants would have achieved a more favorable result had there been an objection.

52

(*Strickland*, *supra*, 466 U.S. at p. 697.)  If counsel had objected when the allegedly objectionable testimony regarding peer review was elicited or given, the court could have prevented the jury from hearing it or ordered it stricken with an admonition not to consider it.  But the jury still would have heard Peck's opinions and been presented with the evidence she relied on to reach those opinions.  The jury also still would have heard and considered all of the other testimony and evidence at trial, which is independently sufficient to reject the finding of prejudice here. Appellants' IAC claim accordingly fails.

  b. *Exclusion Of Proposed Defense Expert*

  Appellants contend the trial court also abused its discretion in excluding the proffered testimony of Dean Faigman, a purported defense expert on the reliability of firearm toolmark methodology.  We disagree.

  Prior to trial, the prosecution moved in limine to exclude Faigman's testimony.  Faigman had testified at an Evidence Code section 402 hearing at the trial of appellants' codefendants, in which the trial judge ultimately found that firearms identification evidence was not subject to the requirements of *Kelly*.  The prosecution asserted that Faigman did not qualify as an expert in ballistics under *Sargon* and Evidence Code sections 801 and 802 because he is merely "an academic scholar" without any expertise, training, or experience in toolmarking or ballistic comparison.  The prosecution also offered that the trial judge in the codefendants' trial had already resolved the issue and found Faigman's opinions to be outside of mainstream science.

  The prosecution submitted transcripts of Faigman's testimony at the Evidence Code section 402 hearing at the

codefendants' trial, the trial judge's ruling, and Faigman's declaration as exhibits. Faigman's declaration states he is a leading scholar on "the use of scientific research in legal decision making" whose writings and teachings relate to "forensic science and issues surrounding proper scientific methodology for scientific evidence offered in applied settings, in particular including courtrooms." The stated "core concern" is "whether firearms identification expertise . . . is generally accepted by the scientific community and possesses a methodological and statistical foundation adequate to support the opinion of firearm expert witnesses in court." Faigman asserted that scientific studies did not support Peck's claim that the source of fired bullets and cartridge cases could be identified or linked to one another, and that the underlying theory and techniques were also not accepted as valid by the relevant scientific community. Faigman declared that "firearms examiners should not be permitted to offer an opinion that a particular bullet or cartridge case came from a particular firearm. A firearms examiner should be limited to testifying only that a particular bullet or cartridge case came from a general type or class of firearms."

At a subsequent hearing on the motion, the trial court gave a tentative decision to exclude Faigman from testifying because he was a law professor with no experience in firearms, his proffered testimony on scientific research and legal decision making was irrelevant, "and to the extent it is relevant, that's the purview of the finder of fact." The court added that a firearms expert or defense counsel, and not merely "an expert in legal theory," could challenge Peck's conclusions and any flaw in how error was measured.

In opposing the motion, Hernandez asserted that Faigman was a qualified expert under Evidence Code section 720 and that his testimony discrediting the prosecution expert's methodology was admissible. Balmore and Ricardo subsequently joined in Hernandez's arguments. Appellants noted that the judge in the codefendants' trial stated the defense had presented legitimate criticisms regarding the reliability of the ballistics comparison analysis. Appellants argued that "[f]irearms identification evidence is, at this juncture, not generally accepted by the relevant scientific community" and Faigman should be allowed "to testify about the many issues in accepting that testimony at face value."

In a reply, the prosecution argued that Faigman's proffered opinion on whether firearms examination evidence should be used as evidence in a criminal case was a legal conclusion usurping the court's gatekeeping role, which the court had already exercised. The prosecution asserted it was not the province of an expert to testify, as proffered by Faigman, that "the [c]ourt should never have permitted the firearms matching testimony and that, now that the testimony will be admitted, the jury should disregard it." The prosecution further asserted that the microscopic comparison of cartridge casings done in this case was the same as the one done in *Azcona* and did not fall within *Kelly*. Moreover, the exclusion of Faigman did not violate appellants' right to present a defense because he did not qualify as an expert "in study design or the foundational validity of the field of firearms identification" and his opinion was based on a theory outside the mainstream of science and unsupported by scientists in the toolmarking field.

55

At the next hearing on the motion, the court reiterated the grounds for its tentative ruling excluding Faigman's testimony. The court noted that Faigman's testimony would be relevant and valid in the context of a *Kelly* hearing, but since the court had already determined the evidence was admissible, the proffered testimony was irrelevant and not helpful to the jury. The court reasoned it would be relevant for an expert in firearms to testify Peck "is wrong and here is why," but that Faigman's testimony that "the entire field of criminal forensic science is flawed" was not relevant.

After hearing further arguments by the parties, the court adopted its tentative ruling as its final ruling. The court referred to Faigman's declaration that "Peck's claim . . . that [bullets and] cartridge [cases] can be linked to one another or uniquely to a particular gun is not supported by the scientific literature or by scientists who [have] evaluated that literature." The court reasoned that Faigman's "piggy-backing in" other experts who are not subject to cross-examination "may improperly have an effect on the jury." Hernandez's counsel stated that she would provide Peck with articles she wanted to discuss on cross-examination, and the court stated, "That's a fair and appropriate way to do it."

The court did not err. "The trial court has broad discretion in determining the relevance of evidence [citations] but lacks discretion to admit irrelevant evidence." (*People v Carter* (2005) 36 Cal.4th 1114, 1166-1167.) The court also exercises broad discretion in deciding whether to admit expert testimony (*Sargon*, *supra*, 55 Cal.4th at p. 773), and has discretion to exclude relevant evidence "if its probative value is substantially

outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)

The court did not abuse its discretion in excluding Faigman's testimony as irrelevant and because it had the potential to confuse the issues or mislead the jury. Faigman intended to testify that Peck should not have been allowed to opine that a particular bullet or shell casing was from a particular firearm because the field of firearms identification and its underlying theory and techniques are not accepted as valid by the relevant scientific community. As the People aptly put it, "it was not up to the jury to decide the scope of Peck's testimony. That gatekeeping role belonged to the trial court." We also agree with the People that while Faigman's testimony at the Evidence Code section 402 hearing in the codefendants' trial may have been appropriate, since the court in this case had already ruled that Peck's opinions were admissible "the same testimony here before a jury was irrelevant and properly excluded."

We also reject appellants' assertion that the alleged error amounts to a violation of their constitutional rights to present a defense. Faigman's proffered testimony was not "crucial defense evidence." (*People v. Cornwell* (2005) 37 Cal.4th 50, 82, overruled in part on other grounds as stated in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) In any event, any error was harmless under any standard. As we have noted, the evidence of appellants' guilt, even independent of the ballistics evidence, was strong. Moreover, Peck was extensively cross-examined on the reliability of firearms identification examinations and the various studies cited by Faigman. Among other things, Peck did not

dispute that in one of the studies she relied on the combined error rates for hard and soft errors was 53 percent for comparing bullets and 44 percent for comparing cartridge cases. She also acknowledged that her opinions were subjective and were not to a scientific certainty. Appellants' claim accordingly fails for lack of prejudice.

VI.

*MS-13's Motto*

Appellants contend the court prejudicially erred in admitting evidence that MS-13's motto is "kill, rape, control." They assert that the reference to "rape" should have been excluded as irrelevant because there were no allegations of rape in the case and the motto should have been excluded under Evidence Code section 352 as inflammatory and highly prejudicial. The court denied appellants' motion to preclude Sergeant Casey from referring to the motto because "[t]he expert is going to say that the local chapter of an international gang relies on the reputation of the international gang to exert control in their location, so it's relevant."

The court did not abuse its discretion in admitting the evidence. The evidence was relevant on the grounds identified by the court. Moreover, as the People aptly note, "[t]he court could reasonably anticipate that any potential prejudice from accurately including the word 'rape' in the motto could readily be—and in fact was—cured by pointing out that the current case did not involve rape allegations and by eliciting the sergeant's testimony that local affiliates of the organization rejected the inclusion of 'rape.' " Because appellants were each acquitted on multiple counts, it is also clear that the jury was not inflamed by evidence of the motto. In addition, the evidence was very brief,

58

and the independent evidence of appellants' guilt was strong. Any error in admitting the evidence was thus harmless. (*People v. Orey* (2021) 63 Cal.App.5th 529, 549; *Watson, supra,* 46 Cal.2d at p. 836.)

## VII.

### *Rap Videos*

The prosecution played three SMLS'LS rap videos at trial without objection and provided the jury with transcripts of those videos. Screenshots of another video were also shown. Appellants contend their trial attorneys provided IAC by failing to object to the videos under Evidence Code section 352. They further contend that Evidence Code section 352.2, which went into effect after they were convicted, applies retroactively to their trial.[17] Our Supreme Court recently rejected the latter contention (*Aguirre, supra*, 18 Cal.5th at pp. 687-693), and appellants do not establish that counsels' failure to object under Evidence Code section 352.2 amounts to IAC.

"Pursuant to Evidence Code section 352, 'The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create

---

[17] "Evidence Code section 352.2, which became effective on January 1, 2023, calls for a particularized inquiry when the admissibility of a creative expression is challenged under Evidence Code section 352. . . . The statute defines a '"creative expression"' as 'the expression or application of creativity or imagination in the production or arrangement of forms, sounds, words, movements, or symbols, including, but not limited to, music, dance, performance art, visual art, poetry, literature, film, and other such objects or media.' [Citation.]" (*People v. Aguirre* (2025) 18 Cal.5th 629, 687 (*Aguirre*).)

substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.'  The 'undue prejudice' that Evidence Code section 352 is concerned with '"is that which ' " 'uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues.' " ' " '  [Citation.]  A ' "court enjoys broad discretion" ' in determining the admissibility of evidence under Evidence Code section 352 [citation], and we review a ruling under the statute for an abuse of this discretion [citation].  'A ruling subject to this standard of review "will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." '  [Citation.]" (*Aguirre*, *supra*, 18 Cal.5th at pp. 686-687.)

To establish that their trial attorneys provided IAC by failing to object to the rap videos under Evidence Code section 352, appellants must demonstrate both deficient performance and prejudice, i.e., a reasonable probability that they would have achieved a more favorable result had counsel objected. (*Strickland, supra,* 466 U.S. at pp. 687-688, 693-694.)  Even assuming that appellants could establish the deficient performance prong, they do not establish the prejudice prong. (See *id.* at p. 697 [when IAC claim fails for lack of prejudice, the reviewing court need not decide whether counsel's performance was deficient].)  The rap videos were not overly inflammatory, the prosecutor only briefly discussed them in her closing and rebuttal arguments, and the jury was instructed on the limited purposes of their admissibility.  Moreover, there was strong independent evidence of appellants' guilt, and they were each acquitted on multiple counts.  Appellants' IAC claims accordingly fail.

## VIII.
### *Prosecutorial Error*

Appellants contend the prosecutor prejudicially erred[18] during her rebuttal argument by misstating the law regarding the presumption of innocence. We are not persuaded.

Claims of prosecutorial error are subject to federal and state standards of review. (*People v. Jablonski* (2006) 37 Cal.4th 774, 835 (*Jablonski*).) The federal Constitution is violated when the prosecutorial error infects the trial with such a degree of unfairness as to render defendant's conviction a denial of due process. (*Ibid.*; *People v. Shazier* (2014) 60 Cal.4th 109, 127.) Prosecutorial error involving comments by prosecutors to jurors has generally been viewed by California courts as error of less than constitutional magnitude (see *People v. Bolton* (1979) 23 Cal.3d 208, 214, fn. 4), warranting "reversal only if it is reasonably probable the trial outcome was affected." (*Shazier,* at p. 127.)

"[A] prosecutor is allowed to vigorously argue the case and is afforded 'significant leeway' in discussing the facts and the law in closing argument. [Citations.]" (*Azcona, supra,* 58 Cal.App.5th at p. 516.) To prevail on a claim of prosecutorial error based on remarks to the jury, a defendant must show a reasonable likelihood that the jury understood or applied the prosecutor's comments in an improper or erroneous manner.

---

[18] Although appellants label the alleged error as "misconduct," " '[t]he term prosecutorial "misconduct" is somewhat of a misnomer to the extent that it suggests a prosecutor must act with a culpable state of mind. A more apt description of the transgression is prosecutorial error.' " (*People v. Centeno* (2014) 60 Cal.4th 659, 666-667 (*Centeno*).)

(*Jablonski, supra*, 87 Cal.4th at p. 835.)  " 'In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.  [Citation.]' [Citations.]" (*Centeno, supra,* 60 Cal.4th at p. 667.)

" ' "The presumption of innocence, although not articulated in the [federal] Constitution, is a basic component of a fair trial under our system of criminal justice." . . .  "[T]he presumption of innocence continues not only during the taking of the testimony, but during the deliberations of the jury and until they reach a verdict." ' [Citation.]  ' "Once an otherwise properly instructed jury is told that the presumption of innocence obtains until guilt is proven, it is obvious that the jury cannot find the defendant guilty until and unless *they*, as the fact-finding body, conclude guilt was proven beyond a reasonable doubt." ' [Citation.]  Thus, although a prosecutor should not make 'statements that appear to shift the burden of proof onto a defendant (as a defendant is entitled to the presumption of innocence until the contrary is found by the jury),' it is permissible to argue that 'the jury should return a verdict in [the People's] favor based on the state of the evidence presented.' [Citation.]" (*People v. Jones* (2024) 106 Cal.App.5th 1085, 1100.)

In her rebuttal argument, the prosecutor told the jury "it's time for accountability.  These defendants were presumed innocent when we started, but not anymore, not since the evidence has been presented.  They have now been proven guilty beyond a reasonable doubt."  After the court overruled Balmore's objection that the prosecutor had misstated that law, the prosecutor continued:  "These serial killers terrorized a community. . . .  They are absolutely guilty of what they did do.

62

They are no longer considered innocent.  Show these victims that we presented the case and it's time for accountability and justice."

After the concluding instructions were read and the jury began deliberating, the court asked the defense if they had anything else they wanted to put on the record.  Balmore's counsel responded by "stress[ing] that [the] presumption of innocence remains until the jury renders a verdict."  The court replied:  "I think it stops once it stops, once the case is closed and they begin deliberating, so it starts once you read them that last instruction.  It's not until they have made a decision.  It's once they have been read [CALCRIM No.] 3550."

We reject the People's contention that appellants' claim of prosecutorial error is forfeited because defense counsel did not request that the jury be admonished to disregard the prosecutor's alleged misstatement of the law.  Because the court overruled counsel's objection, such a request would have been futile.  (See *People v. Johnson* (2015) 61 Cal.4th 734, 781, fn. 15 [recognizing that "the requirement that a defendant also seek a curative instruction to alleviate the effect of improper argument applies only if the court sustains the defense objection as to its impropriety"].)

We conclude, however, that the prosecutor did not misstate the law regarding the presumption of innocence.  Rather, she merely asserted that the evidence presented at trial was sufficient to overcome that presumption.  (See, e.g., *People v. Booker* (2011) 51 Cal.4th 141, 184 [prosecutor did not misstate law by arguing that the presumption of innocence "doesn't stay" and that "[o]nce the evidence convinces you he is no longer innocent, that presumption vanishes"]; *People v. Panah* (2005) 35

63

Cal.4th 395, 463 [prosecutor properly argued to the jury that the evidence presented at trial had " 'stripped away' " the defendant's presumption of innocence]; *People v. Goldberg* (1984) 161 Cal.App.3d 170, 189 [prosecutor did not err in arguing that " 'once the case has been proven to' " the jury beyond a reasonable doubt "[t]here is no more presumption of innocence"].)

The two cases appellants offer in support of their claim to the contrary are inapposite. In *People v. Cowan* (2017) 8 Cal.App.5th 1152, the prosecutor told the jury "the presumption of innocence is in place 'only when the charges are read' and that the 'presumption is gone' thereafter." (*Id.* at p. 1159.) The court of appeal recognized that this statement impermissibly conveyed that the presumption of innocence no longer applied as a procedural matter once the trial began and thus constituted an improper attempt to lighten the prosecution's burden of proof. (*Id.* at p. 1160.) Here, by contrast, the prosecutor did not suggest that the presumption had ended before the close of evidence and that the presumption was unrelated to the evidence.

In *People v. Dowdell* (2014) 227 Cal.App.4th 1388, 1407, the prosecutor stated in closing that " '[t]he presumption of innocence is over.' " (*Id.* at p. 1407, italics omitted.) The prosecutor first used this phrase while discussing the state of the evidence, which the court of appeal found analogous to the remarks approved in *Goldberg.* (*Id.* at pp. 1407-1408.) Although this first statement was not improper, the appellate court held that the prosecutor erred by using the phrase a second time when he said, " 'It's fairly obvious that [the defendant] committed all of the crimes we are accusing him of. The presumption of innocence is over. He has gotten his fair trial.' " (*Id.* at p. 1407, italics omitted.) The court reasoned that these remarks

64

improperly "implied that the 'fair trial' was over" and that the jury should consequently no longer "respect the presumption of innocence." (*Id.* at p. 1408.) Here, the prosecutor merely argued that the presumption of innocence no longer applied because the evidence at trial had proven appellants were guilty beyond a reasonable doubt. Her remarks were thus more analogous to those approved in *Booker*, *Panah*, and *Goldberg* than those found improper in *Dowdell*.

Even assuming that the prosecutor misstated the law, any error would be harmless regardless of the standard of review. The jury was instructed with CALCRIM No. 220 on the presumption of innocence and the prosecution's burden of proving guilt beyond a reasonable doubt. The court also instructed the jury pursuant to CALCRIM No. 200 that "[i]f you believe that the attorney's comments on the law conflict with my instructions, you must follow my instructions." We presume the jury understood and followed these instructions. (*People v. Frederickson* (2020) 8 Cal.5th 963, 1024.) Appellants' claim of prosecutorial error thus fails.

IX.

*Hernandez's Mistrial Motion*

Hernandez contends the trial court abused its discretion in denying his motion for a mistrial based on comments the prosecutor made on rebuttal regarding Hernandez's counsel's presentation to the jury of an incorrect exhibit regarding the location of the shootings of Martinez, Castillo, and Alfaro. We conclude otherwise.

A trial court should grant a motion for mistrial " 'only when a party's chances of receiving a fair trial have been irreparably damaged . . . .' " (*People v. Schultz* (2020) 10 Cal.5th 623, 673.)

65

" ' "A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions." ' " (*People v. Suarez* (2020) 10 Cal.5th 116, 148 (*Suarez*).) We review the denial of a mistrial motion for abuse of discretion. (*Schultz*, at p. 673; *People v. Penunuri* (2018) 5 Cal.5th 126, 149.)

In her closing argument, Hernandez's attorney argued that aside from the rap song and the 2014 photograph showing him making a gang sign, there was no evidence against Hernandez regarding the shootings of Martinez, Castillo, and Alfaro. Counsel asked the jury to compare Agent Easter's chart mapping Hernandez's cellphone activity in People's Exhibit 46-P5 with the report of Hernandez's expert Rose. She claimed the map in the People's exhibit contained "[a] huge mistake" by erroneously identifying the location of the crime scene. According to defense counsel, Hernandez's phone appeared to be in the crime scene area as the prosecutor claimed because "when you plot it wrong, it is." Defense counsel argued that the crime scene was correctly located in Rose's slide, which demonstrated that Hernandez's phone was not within the crime scene area at 10:39, 11:37, or 11:40 p.m.

In her rebuttal argument, the prosecutor discussed People's Exhibit 46-P5 and told the jury that Hernandez's counsel showed them "an incorrect exhibit." The prosecutor asserted: "That was not the exhibit that's been admitted into evidence. This is the exhibit that's been admitted into evidence. This is the People's exhibit. This is Special Agent Easter's map with the correct crime scene location. I don't know where that came from. This is

66

the evidence. . . . And this is from the Blosser shooting and defendant Jose Hernandez's phone is in the area, consistent with being in the area of the crime scene. Special Agent Easter told you that and the defense cell tower witness told you that. He said, yeah, it's consistent. I agree with Agent Easter's map. There is no question."

The court gave its final instructions, and the jury began its deliberations. Following an unrecorded discussion, the court stated that various issues regarding exhibits would be discussed the next morning, and the parties agreed to waive their clients' appearance. The court asked the parties whether there was anything else they wanted to put on the record, and Hernandez's counsel replied "[n]o, your honor. Thank you."

Following another unrecorded discussion the next morning, the prosecutor stated that Hernandez's counsel had suggested that Hernandez suffered prejudice as a result of the prosecutor's comments regarding People's Exhibit 46-P5; counsel had declined, however, the prosecution's offer to reach a stipulation as a remedy. The court said the issue would not be discussed without the defendants being present and continued the matter to the following day. The court denied the prosecutor's request to address and resolve the issue without delay and told Hernandez's counsel "[i]t's up to you to decide how to frame the issue and what, if any, remedy you are requesting." Counsel stated that the prosecution's proposed stipulation "cast[] blame on the defense instead of having the government take any responsibility . . . [for] continu[ing] to provide discovery after [the] discovery cut-off period." After the court suggested that they work on a stipulation "where the language is satisfactory to all the parties,"

the prosecutor added that "I didn't offer any parameters for a stipulation. I just suggested a stipulation."

That same day, Hernandez filed a motion for mistrial alleging prosecutorial misconduct based on People's Exhibit 46-P5. The motion alleged that prior to trial the prosecution provided defense counsel a flash drive containing about 3,000 exhibits that were pre-labeled with "electronic" exhibit numbers. The prosecution continued sending new discovery to the defense throughout jury selection and trial, including 30 disks. Because the prosecution did not specify that one of those disks (Disk 444) contained a "new" People's Exhibit 46-P5 that was "altered to correct a significant error," counsel was unaware of this new exhibit.

Hernandez's motion also offered that his trial counsel pointed out the mistake in the original People's Exhibit 46-P5 to the jury "not knowing a new exhibit existed." According to Hernandez, the prosecutor showed the jury the corrected version of the exhibit in her rebuttal argument and "then attacked the integrity of defense counsel by suggesting that defense counsel was incompetent for displaying the 'wrong' exhibit, or that defense counsel purposely doctored the exhibit." Hernandez also asserted that the prosecutor acted in bad faith because she knew the pre-labeled People's Exhibit 46-P5 (which contains incorrect information regarding the location of the crimes) had the same number as the replacement exhibit (which contains the correct information). The motion added that Hernandez's counsel had attempted to make an oral motion for mistrial before jury deliberations began, but the court denied her request and asked for a written motion.

In opposing the motion, the prosecution argued that Hernandez's counsel "knowingly and intentionally misled the jury" by displaying an exhibit she knew had been corrected. Agent Easter corrected the mistake in the original exhibit, misidentifying the crime scene location as one block south of the actual location, and the People provided the corrected exhibit to the defense in Disk 444. Agent Easter and Hernandez's cell tower expert Rose both testified to the correct exhibit at trial, and that exhibit was admitted into evidence. The prosecutor's comments in rebuttal did not denigrate counsel's integrity but merely responded to counsel's argument about the exhibit and directed the jury to the exhibit that was actually admitted at trial. In any event, counsel's failure to object forfeited the opportunity for a curative instruction or admonition. Moreover, counsel's refusal to discuss the prosecutor's offer to formulate a stipulation before the jury began deliberating indicated counsel did not "truly" believe the harm was prejudicial.

The next morning, the court heard the motion and denied it. The court noted that each exhibit was marked in court on the record and that all slides shown during closing arguments were merely demonstrative aids, not evidence. The court found that neither attorney engaged in misconduct and "that this issue is not one that rises to the level of irreparable damage or the fairness of a trial." The court added that "[t]he court is not going to take any further action, is not going to give an instruction to the jury; however, if the parties reach a stipulation, the court would read that stipulation to the jury."

The court did not abuse its discretion. Hernandez fails to show he suffered any prejudice as a result of the confusion regarding the correct version of People's Exhibit 46-P5 that could

69

not have been cured by an admonition or instruction. (*Suarez*, *supra*, 10 Cal.5th at p. 148.) After Hernandez's counsel presented the jury with the incorrect version of the exhibit, the prosecutor properly exercised her "wide latitude in describing the deficiencies in opposing counsel's tactics and factual account. [Citations.]" (*People v. Bemore* (2000) 22 Cal.4th 809, 846.) Contrary to Hernandez's claim, the prosecutor did not suggest that defense counsel had deliberately presented the wrong exhibit. As the People note, "[t]he prosecutor did not attribute the misidentification of the exhibit to Hernandez's counsel at all." Hernandez does not undermine the court's finding that the prosecution's comments regarding the exhibit were not made in bad faith. Moreover, defense counsel did not object when the prosecutor made her comments on rebuttal and declined the prosecution's offer to reach a stipulation regarding the issue that could have been read to the jury. Accordingly, Hernandez's motion for a mistrial was properly denied.

## X.

### *Cumulative Error*

Appellants contend their convictions should be reversed due to cumulative error. As set forth above, appellants fail to demonstrate any prejudicial error. Even if we agreed that appellants' claims of evidentiary error had merit, the claimed errors were insignificant in light of the evidence of appellants' guilt. Appellants' contentions of cumulative error accordingly fail. (*People v. Homick* (2012) 55 Cal.4th 816, 884.)

## XI.
## Hobbs *Review*

Prior to trial, appellants moved to unseal and obtain copies of the affidavits submitted in support of the wiretap orders. The prosecution opposed the motion pursuant to *Hobbs* and Evidence Code section 1041 and asked the court to conduct an in camera hearing.

After conducting such a hearing, the court noted the prosecution had agreed that almost all of the affidavits could be provided to the defense. The court agreed with the prosecution that the informants identified in the affidavits were not material witnesses and that there was thus good cause to redact all information related to the identity of those informants. The court granted the prosecution's motion to seal the materials related to the *Hobbs* motion and hearing.

In January 2020, the court stated it had conducted an in camera hearing pursuant to *Hobbs* at which Sergeant Casey had testified about the continued need to keep portions of the affidavits at issue under seal. The court ordered two items to be unredacted and released to the defense and the remaining portions of the affidavits to remain sealed.

Appellants ask us to independently review the sealed record of the hearing on their *Hobbs* motion to determine whether the court abused its discretion in denying the motion.

Under Evidence Code sections 1041 and 1042, all or part of an affidavit in support of a search warrant may be sealed when necessary to protect the identity of a confidential informant. (*Hobbs*, *supra*, 7 Cal.4th at pp. 963, 970–971.) But when an affidavit in support of a search warrant has been sealed, it conflicts with a defendant's right to "reasonable access to

71

information that might form the basis for challenging the validity of a search warrant." (*Id.* at p. 962.) In this situation, a defendant may file a "*Hobbs* motion" to have the trial court either unseal the affidavit and/or to have the trial court review the affidavit in camera to determine whether it provides probable cause for the issuance of the search warrant. (*Id.* at p. 975.) The court then must "examine the affidavit for possible inconsistencies or insufficiencies regarding the showing of probable cause." (*Id.* at pp. 973, 970.) A trial court should review "all the relevant materials in camera to determine whether they will support defendant's challenges to the search warrant." (*Id.* at p. 971.)

In conducting such a review, the "first step is to determine whether the affidavit or any major portion of it has been properly sealed." (*People v. Heslington* (2011) 195 Cal.App.4th 947, 957 (*Heslington*).) Courts must consider two issues: (1) " 'whether sufficient grounds exist for maintaining the confidentiality of the informant's identity' "; and (2) " 'whether the extent of the sealing is necessary to avoid revealing the informant's identity.' " (*Ibid.*)

If the court concludes the affidavit was properly sealed, the court then considers the second step of the *Hobbs* procedure. (*Hobbs*, *supra*, 7 Cal.4th at pp. 974–975.) At this step, the court must "determine whether 'there is a reasonable probability the defendant would prevail' on his suppression motion." (*Heslington*, *supra*, 195 Cal.App.4th at p. 957.) On a motion to quash, the court must assess "whether, under the 'totality of the circumstances' presented in the search warrant affidavit and the oral testimony . . . there was 'a fair probability' that contraband or evidence of a crime would be found in the place searched pursuant to the warrant." (*Hobbs*, at p. 975.) On a motion to

traverse, the court determines whether the defendant's general allegations of misrepresentations or omissions are supported by the search warrant affidavit or testimony offered at the in camera hearing. (*Id*. at pp. 974–975.) If the court concludes there is a reasonable probability of success, the People must consent to release the sealed portion, or the motion must be granted. (*Heslington*, at pp. 957–958.) "We independently review the court's decision to seal a portion of the search warrant affidavit." (*People v. Camel* (2017) 8 Cal.App.5th 989, 1009.)

Having reviewed the relevant record, we conclude the trial court did not err in ordering the affidavits to be sealed. (See *People v. Martinez* (2005) 132 Cal.App.4th 233, 241–242 [appellate court conducts an independent review of the sealed materials].) Sufficient grounds support maintaining the confidentiality of the informants' identities. Releasing any sealed information would tend to reveal those identities. There were no material misrepresentations or omissions in the sealed affidavits. We agree with the trial court and conclude that under the totality of the circumstances, the wiretap orders were supported by probable cause.

XII.

*Fines And Assessments*

Appellants contend the trial court erred in imposing and staying a parole revocation fine as to each of them pursuant to section 1202.45, subdivision (a), because none of their sentences include a period of parole. The People properly concede the point. (See *People v. Battle* (2011) 198 Cal.App.4th 50, 63 [parole revocation fine improperly imposed upon defendant sentenced to indeterminate term on one count and LWOP on another].) Accordingly, we shall order the parole revocation fines stricken.

73

We also agree that Ricardo and Hernandez's judgments must be corrected to reflect the proper court facilities and court operations assessments.[19] Under Government Code section 70373, appellants must pay a $30 court facilities assessment on each count of conviction. Under section 1465.8, they must each pay a $40 court operations assessment as to each count on which they were convicted. Ricardo was convicted on 32 counts, so the court should have imposed a total court facilities assessment of $960 under Government Code section 70373, and a total court operations assessment of $1,280 under section 1465.8. Hernandez was convicted on 23 counts, so he must pay a $690 court facilities assessment and a $920 court operations assessment. We shall order Ricardo and Hernandez's abstracts of judgment modified accordingly.

Appellants also contend for the first time on appeal that the court violated their constitutional rights, as contemplated in *People v. Dueñas* (2019) 30 Cal.App.5th 1157, overruled in part by *People v. Kopp* (2025) 19 Cal.5th 1, 23, by ordering each of them to pay a $10,000 restitution fine (§ 1202.4, subd. (b)), a court operations surcharge (Gov. Code, § 69926, subd. (a)), and court facilities and court operations assessments (Gov. Code, § 70373, § 1465.8, subd. (a)(1)), without first determining their ability to pay. Because these contentions were not raised below, they are forfeited. (*People v. Trujillo* (2015) 60 Cal.4th 850, 856–

_____

[19] As to Ricardo, the court orally imposed a $750 court facilities assessment under Government Code section 70373, and a $1,000 court operations assessment under section 1465.8. Ricardo's abstract of judgment, however, reflects a court facilities assessment of $1,230 and a court operations assessment of $1,640. Hernandez was ordered to pay a $1,230 court facilities assessment and a $1,640 court operations assessment.

859; *People v. McCullough* (2013) 56 Cal.4th 589, 597–598; *People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1153–1155.)

*Disposition*

The parole revocation fines imposed and stayed as to all three appellants pursuant to section 1202.45, subdivision (a), are ordered stricken. The judgment as to Ricardo is further corrected to reflect the imposition of a $960 court facilities assessment under Government Code section 70373, and a $1,280 court operations assessment pursuant to section 1465.8. The judgment as to Hernandez is further corrected to reflect the imposition of a $690 court facilities assessment and a $920 court operations assessment. The minute order for Hernandez's sentence shall also be corrected to reflect a total term of 339 years to life plus 4 terms of life without the possibility of parole. The superior court clerk shall forward certified copies of the amended abstracts of judgment to the California Department of Corrections and Rehabilitation. As so modified, the judgments are affirmed.

NOT TO BE PUBLISHED.


YEGAN, Acting P. J.

We concur:


BALTODANO, J.


VAN ROOYEN, J.*

---

* Judge of the San Luis Obispo Sup. Ct., assigned by the Chief Justice pursuant to art VI, § 6 of the Cal. Const.)

75

Michael J. Carrozzo, Judge
Superior Court County of Santa Barbara

_____

Robert L.S. Angres, under appointment by the Court of Appeal, for Defendant and Appellant Jose Balmore Saravia Lainez.

Alex Green, under appointment by the Court of Appeal, for Defendant and Appellant Jose Ricardo Saravia Lainez.

Janyce Keiko Imata Blair, under appointment by the Court of Appeal, for Defendant and Appellant Jose Narciso Escobar Hernandez.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Scott A. Taryle, Supervising Deputy Attorney General, Yun K. Lee, Deputy Attorney General, for Plaintiff and Respondent.